# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### CIVIL DIVISION

| | | |
|---|---|---|
| **BRENT A. ADKINS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Case No. 1:17-cv-00643-SJD** |
| **v.** | § | |
| | § | **Judge Susan J. Dlott** |
| **MARATHON PETROLEUM** | § | |
| **COMPANY, LP,** | § | |
| **Defendant.** | § | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO MARATHON PETROLEUM COMPANY LP'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY SANCTIONS

COMES NOW Plaintiff, Brent Adkins, by and through the undersigned counsel, and provides the following memorandum in response to Defendant Marathon Petroleum Company, LP's ("MPC") memorandum in response to Plaintiff's motion for discovery sanctions (Doc. 65.)

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY ........................................................................ 2

    A.   THE PROBLEM ............................................................................................. 2

    B.   THE REFUSAL ............................................................................................. 3

II. APPLICABLE LAW ............................................................................................... 8

    A.   Applicability of 33 CFR § 96 ...................................................................... 8

    B.   Case Law Authorities .................................................................................. 11

III. FIVE MISSING AREAS OF INFORMATION FROM MARATHON ................ 12

IV. PLAINTIFF'S SUBSTANTIVE REPLY ............................................................................ 14

V. DISCUSSION OF MISSING DOCUMENTS AND  MISSING TESTIMONY – 5 SUBJECT
    AREAS ............................................................................................................................ 15

    A.    SUBJECT AREA 1: NO INDUSTRIAL HYGIENE RECORDS WERE PRODUCED

           NO TESTIMONY TO INDUSTRIAL HYGIENE STUDIES FOR MEASUREMENT

           OF LEVELS OF $H_2S$ ON BARGES OR DOCKS HAVE BEEN PRODUCED ........ 15

    B.    SUBJECT AREA 2: NO MEDICAL FOLLOW UP REGARDING MR. ADKINS

           WITH KNOWING HE HAD ANORMAL PULMONARY TEST SCORES ............ 23

    C.    SUBJECT AREA 3: MUST EMPLOYEES WEAR A SCBA WHEN OPENING

           HATCH COVERS? .................................................................................................. 27

    D.    SUBJECT AREA 4: TESTIMONY OF MR. EARL RE: WHERE PLAINTIFF

           WORKED AND WHAT PRODUCTS MR. ADKINS WAS EXPOSED - CANNOT

           ANSWER OR PRODUCE RECORDS ..................................................................... 27

    E.    SUBJECT AREA 5: DEFENDANT HAS NOT PRODUCED THE SMS RECORDS

           REQUESTED .......................................................................................................... 30

VI. CONCLUSION.................................................................................................................. 31

# I.  INTRODUCTION AND SUMMARY

**A.**    **THE PROBLEM**

1) Plaintiff continues to spend enormous resources on what is customary and simple

discovery for an exposure case:

2) Where and when did plaintiff work on your barges?

3) What barges carried what chemicals?

4) What pre-work industrial hygiene surveys did your firm or one acting for you perform to test for part per million (PPM) airborne hydrocarbons of $H_2S$ and other volatile hydrocarbon fumes?

5) Produce the records for the above.

These questions and these documents Marathon continues to suppress.

**B.    THE REFUSAL**

To this date, defendant has produced no witness, no affidavit, no person, and no declaration made under penalty of perjury, to swear to the non-existence of documents, or that they ever existed. The court ordered production responsive to Plaintiff's Request for Production of Documents No's 28, 29 and 30. Marathon has never said these documents cannot be located. Rather, they produced witnesses that admit to and allude to the existence of the documents. RFP No. 28, 29 and 30 are in large part identical to 15 "m" and "o" of the 30(b)(6) deposition. (The court order is document 38-main).

Instead of offering to produce what witnesses Brown and Perdue admit clearly exist as Industrial Hygiene documents, they engage in a nonsensical diatribe at pages 1-4 of their "MARATHON PETROLEUM COMPANY LP'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY SANCTIONS" (Doc. 65).

Defendant has not produced any information as to how they generated their 142-page document which they claim is "Industrial Hygiene" ("IH") data, i.e. Exhibit 20 to 30(b)(6) witness S. Perdue's deposition.

Defendant has not produced the "Data Base" that Mr. Perdue claims as the source of Exhibit 20. He says:

"This is a comprehensive list of all samples

taken on personal atmospheric monitoring for the exam

> process between marine and terminal transports and rail from 2006 to
> 2000- certain time frame."

Perdue testified there are incident and witness reports to each $H_2S$ incident in Exhibit 22, and they have not been produced. Dep. Perdue 149:12-19, 152:12-18, 155:12-15.

Neither Exhibit 20 or 22 offers any explanation of what barge or dock is involved, or whether any loading or unloading was happening.

Mr. Perdue says Exhibit 20 covers, rail, terminal, and marine samples. He claims it covers all samples from '09 to '12. However, Exhibit 22 contains "alerts" in $H_2S$ PPM that are not present in Exhibit 20.

This is one reason the data bases for both Exhibit 20 and 22 are required and requested.

Perdue testified that the only recordations are badge alarms, saying there are "no log entries other than badge alarms," (Dep. Perdue 253:25 - 254:3. If this is true, then why does the 142-page Exhibit 20 exist?

They offer no explanation by whom it was generated, no cover page, no reference to what cargo it pertains, related to what barge or dock location, and give no information for what employees under what occupation and tasks were present during the data gathering.

The production of that Exhibit 20 document, when compared to the testimony of S. Perdue, are in contradiction to each other. Perdue talks about $H_2S$ badge alarm data, and that data is not found in Exhibit 20. As noted in plaintiff's motion, Exhibit 20 is not an Industrial Hygiene Study. (See Exhibit 12, Dr. Jones' July report at page 1, paragraph 2, referring to Exhibit 20, 142 pages). Expert Dr. Jones explains it in this report.

> "The exposure monitoring data report produced by Marathon (MPC-
> Adkins 10579-10720) appears to be a print out of a database that includes
> a variety of personal exposure monitoring results, including time-weighted
> average and short-term exposures (exact durations unspecified). The

exposure monitoring data report was not provided to me in conjunction with metadata…

High quality exposure monitoring data must include more than just the measurement result – e.g., the concentration of hydrogen sulfide or hydrocarbons. As described by Hewett and Simmons (2015), high quality exposure data should include information about: the sampling strategy, the sampling method, quality assurance procedures, field notes, data management, the person sampled, the job or task performed during sample collection, the site and process at which sampling occurred, the use of engineering controls and the use of personal protective equipment.

The completeness and accuracy of this unidentified and un-authored hearsay document is clear. (Exhibit 20). This point was made and documented in Plaintiff's Amended Memorandum in Support of Sanctions, Doc. 58, pages 29 and 30:

"3). Hydrogen Sulfide Badge Monitoring

In Defendant's responses to Plaintiff's Second Request for Production of Documents, Exhibit 15, at page 2, a table of 17 hydrogen sulfide badge alarms 2009-2012 including readings in excess of 100 ppm (a level determined by NIOSH to pose Immediate Danger to Life and Health, IDLH), were presented. These records were commented that "neither Chuck Adkins nor Plaintiff Brent Adkins had their monitors alarm during this time."

Witness Perdue testified that he produced this table. Dep. Perdue 158:15-19. This table does not include alarms on hydrogen sulfide badge read-outs for badges identified as having been worn by Russel Mackey and John Kitchen in 2012 (Bates Adkins 4097-4098, Exhibit 16), suggesting the disclosure or database of incident reports may be incomplete. Perdue also testified that the read-outs from these three badges were produced by the badge manufacturer because Defendant wanted the data retrieved. Dep. Perdue, 177:6-178:10; and Adkins 4097-4099."

MPC argues that if their witnesses were conversant in giving subject-meaningful responses, to questioning- (ignoring the duty to answer questions specifically in the Topics) – is sufficient. (Doc. 65, page 8, paragraph two). 30(b)(6) witnesses Perdue, Boggs, Earl and Brown could not or would not give meaningful answers to "five-core" discovery areas outlined below. These are simple straight forward questions regarding core issues.

Marathon continues to ignore this court's order of May 14, 2019 (Doc. 38-main), and Marathon has not answered Plaintiff's Request to Produce Documents as ordered. These matters are specifically documented below in Section III by Plaintiff.

Their 30(b)(6) witness testimony is deficient and displayed a lack of knowledge of what Industrial Hygiene tests registered in values, where they were done, and on what products they were done. The witnesses did not produce IH records. The IH Topic covered the spectrum of $H_2S$ and volatile hydrocarbons, including benzene.

This failure of cooperation is consistent with their past answers to discovery. Their modus operandi is:

1) "Catch me if you can."

2) "Let's stir the confusion."

Sanctions are deserved. MPC has not made any effort to correct their deficiencies. On page 35 of their reply memorandum (Doc. 65), MPC refers to "hurt feelings." They miss the point. They refused, in the Louisiana litigation, as here, to tell the truth as to where Plaintiff worked, and they still refuse to do it. It is simply evidence of a continuing scheme. Fed. Rule of Evidence 406. Under penalty of perjury, undersigned heard Mr. Ray Massey in the Louisiana court state told the district judge, in court, "the Marathon records are destroyed after three years. I guess because the statute of limitations is three years." This statement was not true. It shows

MPC's original intent to suppress essential information on what barges Mr. Adkins worked. It shows MPC's intent to suppress what cargo, what fumes, what was the known probable level of exposure found in IH sampling, and the actual exposure history documented in IH testing. These basic documents have not been provided by MPC. It has led to this endless display of "vague and ambiguous" objects, no proper 30(b)(6) witnesses on exposure, and "catch me if you can."

In defendant's reply memorandum (Doc. 65), at page 5, Marathon states Plaintiff did not refer to specific missing documents. This is not true. It is covered in series at pages 12, 13, 27-33, 40 and page 41 of Plaintiff's Amended Final Memorandum in Support of Plaintiff's Motion for Discovery Sanctions, Doc. 58. There, Plaintiff refers to the document entitled:

> Marine - Barge - Loading and Unloading Operating Procedure
>
> "All high sulfur product loads will be checked by crew member using supplied air and a four gas (H2S) monitor in breathing zone prior to accepting the barge for tow." Adkins 001935.

And, at page 41 states: "NOTE referenced document "TNLHES008 Hydrogen Sulfide Exposure Control Program" WAS NOT PRODUCED." This document is essential to understanding what Marathon was supposed to do to control $H_2S$ exposure.

Exhibit 28 to the Marathon 30(b)(6) deposition references "conduct an exposure assessment in accordance with HES Standard 415 Industrial Hygiene Exposure Assessment Program". This HES Standard document was not produced.

Plaintiff's Memorandum, at page 27, states the genesis of MPC's mysterious 142-page report (Exhibit 20 to S. Perdue deposition), is undocumented, the meta core documents were not produced, and it is not an Industrial Hygiene study. Dr. Jones explained this in her declaration, Exhibit 12 to Plaintiff's Memorandum in Support of Sanctions, Doc. 58, and this is explained in

Plaintiff's Memorandum in Support of Sanctions, page 28, paragraph two. This exhibit explains the missing parts of defendant's industrial hygiene data.

Plaintiff's memorandum, at page 29, paragraph two, states that Marathon's data marked as MPC-Adkins 10579-10720, (142 pages), does not represent high quality monitoring exposure monitoring data as it is missing most of the data described by Hewett and Simmons (2015). Exhibit 12, Para. 5.

Other missing documents of the Safety Management System are alluded to in Plaintiff's Original Memorandum in Support of Sanctions, Doc. 58.

## II. APPLICABLE LAW

Plaintiff requested the complete Safety Management System (SMS) document. It has not been produced. This document is important and applicable to this case.

### A. Applicability of 33 CFR § 96

This CFR applies in the current matter because:

- Defendant is a member of American Waterways Operators (AWO). Dep. Earl 51:3-52:20.

- AWO Requires a certified Responsible Carrier Program (RCP). Dep. Earl 52:11-16.

- Plaintiff's expert witness Captain Stoller describes requirements of AWO membership and their RCP beginning on page 15 of his report attached as Exhibit 1:

    "All member companies of AWO are required to have and maintain a Responsible Carrier Program Manual which is considered a Safety Management System.

AWO members had to commit to operating their companies to operate safely and responsibly by implementing the Responsible Carrier Program, and then demonstrate their implementation by undergoing a comprehensive third-party audit conducted by professional, experienced and knowledgeable auditors. 16

In December 2003, the AWO Board of Directors voted to pursue a towing vessel inspection system that builds upon the Responsible Carrier Program in concert with the USCG. Congress, in the USCG and Maritime Transportation Act of 2004, added towing vessels to the list of vessels subject to inspection and authorized.

Each towing company should develop and document written policies and procedures. Companies should abide by these policies in conducting their operations and should ensure that their employees are aware of, and trained in, those policies and procedures which affect their job responsibilities.

Companies should develop a mission statement expressing their commitment to abide by their established policies and procedures and to ensure employee awareness and knowledge. All AWO carrier members, as a baseline, should be in compliance with all applicable federal laws and regulations concerning marine safety and environmental protection. All company policies and procedures should be consistent with applicable law and regulation and with the guidelines provided in the Equipment and Inspection and Human Factors sections of the AWO Responsible Carrier Program. Required procedures are to be documented and implemented."

- An applicable federal law and regulation to be adhered to in a members RCP, as required by AWO membership, requires compliance with 33 CFR § 96.250, and that requires numerous documents as itemized in Exhibit 2 to this Memorandum; key ones itemized below:

| (k) Safety management system document and data maintenance | (1) Procedures which establish and maintain control of all documents and data relevant to the safety management system. |
| | (2) Documents are available at all relevant locations, i.e., each vessel carries on board all documents relevant to that vessels operation; |
| | (3) Changes to documents are reviewed and approved by authorized personnel; and |
| | (4) Outdated documents are promptly removed. |

Also, another relevant sub-section to 33 CFR § 96 is § 96.310:

This subpart applies:

(a) If you are a responsible person who owns a vessel(s) registered in the U.S. and engaged on a foreign voyage(s), or holds certificates or endorsement of such voyages;

(b) If you are a responsible person who owns a vessel(s) registered in the U.S. and volunteer to meet the standards of this part and Chapter IX of SOLAS;

(c) To all foreign vessels engaged on a foreign voyage, bound for ports or places under the jurisdiction of the U.S., and subject to Chapter IX of SOLAS; or

(d) If you are a recognized organization authorized by the U.S. to complete safety management audits and certification required by this part.

The existence of these programs, Defendant's participation in them and the audit requirements confirm that the requested "program" documents must exist, are applicable to this matter, and should have been produced. But as detailed in this and Plaintiff's Memorandum in Support of Sanctions (Doc. 58) these documents have not been produced.

In the instant matter, MPC witness Earl admitted Marathon has a SMS and has been an AWO member since 2007. Dep. Earl 54:20 - 55:9 and 56:17-22.

The import of the SMS is it requires incident investigation, corrective action, record-keeping, and analysis of incidents. See, e.g. 96.230, 240, and 250. Record-keeping is not an option. Compliance with the law is mandatory. See 33 C.F.R. 96.310.

**B.     Case Law Authorities**

The case of Brazos River Auth. v. G.E. Ionics, Inc., 469 F.3d 416, 432-34 (5th Cir. 2006), held that:

> "Rule 30(b)(6) is designed to avoid the possibility that several officers and managing agents might be deposed in turn, with each disclaiming personal knowledge of facts that are clearly known to persons within the organization and this to the organization itself."

In addition, they said, 'Therefore, the deponent must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by the party noticing the deposition and to prepare those persons in order that they can answer fully, completely, un-evasively, the questions posed to the relevant subject matters."

Moreover, "The deponent must prepare the designee to the extent matters are reasonably available, whether from the documents, past employees, or other sources."

The defense could have replied, apologized for any un-intentional error, alleged it was a mistake, and corrected their transgressions. Instead, they misquote the law, the plain meaning and language of Rule 30(b)(6), and in doing this argue against due process of law, fundamental fairness. They have yet to provide an affidavit from a records custodian or officer of the company stating either the documents are lost, destroyed or never existed.

The responding party's duty to prepare a Rule 30(b)(6) witness "goes beyond matters personally known to the designee or to matters in which the designated witness was personally involved." QBE Ins. Corp. v. Jorda Enterprises, Inc. 277 F.R. D. 676,689 (S.D. Fla 2012)

The testimony of a Rule 30(b)(6) witness represents the collective knowledge of the organization, not the specific witness's knowledge. The responding party must prepare its witnesses to provide non-evasive, complete, and binding answers for the organization.

Calzaturficion S. C.A.R.P.A. S.P.A. v. Fabianon Shoe Co. 201 F.R.D. 33, 36 (D. Mass 2012) and Bucyks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995).

In other words, a responding party is expected to create an appropriate witness or witnesses to testify about all information that the organization knows. Fed. R. Cic. Proc. 30(b)(6) advisory committee's noes, sub. (b) (6) (1970 Amendment).

Taylor v. Shaw, 2007 WL 710186 (D. Nev. March, 2007), citing Int'l Ass'n Of Machinists & Aerospace Workers v. Werner- Masuda, 390 F. Supp 2d 479, 487 (D. Md. 2005).

The law is clear: "If the designated agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all." Reilly v. NatWest Mkts. Grp., 181 F.3d 253, 268 (2d Cir. 1999).

### III. FIVE MISSING AREAS OF INFORMATION FROM MARATHON

Plaintiff will focus on five (5) key subject areas of discovery for which no valid response has been forthcoming from MPC. These are:

1) No Industrial Hygiene Survey Records were produced. (Badge read-outs are not Industrial Hygiene surveys). This includes those for the North Bend, Ohio, and Garyville, La., Norco, La., New Orleans, La. and other La. loading docks, loading and unloading shore-side terminals, testing done on barges for loading or unloading $H_2S$ laden products and other volatile hydrocarbons. The request was for the relevant time period.

   - No industrial hygiene records were produced for core data for the 142-page document (Exhibit 20 to S. Perdue deposition) that lists only twelve (12) $H_2S$ records out of a total list of greater than 3,500 records (0.34%.)

- None of the Industrial Hygiene records that Mr. Perdue stated were done by MPC and by Bureau Veritas were produced or said to be unavailable. They fall under RFP 28, 29 and 30; the Court-ordered them to be produced.

- No records were produced pertaining to the Garyville, La. July 27th badge alerting for high $H_2S$. This was testified to by Marathon witness Mr. Brown. The name of the persons involved were not given, the records of what level of $H_2S$ was not disclosed, the incident report was not produced. Adkins was said to be present and working at that time and place. This was sought in 30(b)(6) RFP "m" and "o."

- Between 2002 and 2012 Brown unloaded asphalt and VGO at Marathon's North Bend terminal using forced air ventilation because of the presence of $H_2S$. (Brown Dep. p. 48, line 1-8). None of these records have been produced.

- The "plan document" described by Mr. Perdue that sets forth how Marathon will do its Industrial Hygiene sampling has not been produced.

- "TNLHES008 Hydrogen Sulfide Exposure Control Program" document has not been produced. (Page 41 of Plaintiff's Motion), and RTP in notice at "g" page 17.

- Plaintiff's First Request for Production of Documents, Court- ordered to be answered to No.'s 28, 29, and 30.

2) No medical doctor or medical director notes for any corporate follow-up to Mr. Adkins health examinations and hospitalization for tachycardia condition were produced. These were requested in 30(b)(6) NOD at RFP D 13, and D3, D6 b, D6 j, D6 o, and D7 c. No doctor records were produced relative to Mr. Adkins Pulmonary Function tests. Mr. James Lavelle is a Physician's Assistant, not a medical doctor (M.D). Nor have any MPC medical review records been produced that discuss why

Mr. Adkins was allowed to continue to work, despite the fact his FVC (Forced Vital Capacity) is below normal, and disqualifies him under pertinent USCG regulations. This will be proved at trial.

3) No person has been produced that works for MPC, or for anyone else, with any knowledge of whether or not SCBA (Self Contained Breathing Apparatus) must be worn when opening tank covers, and a four-gas meter is to be used, per the MPC practices found at Exhibit 9, Bates Adkins_001935 to Plaintiff's Memorandum in Support of Sanctions, Doc 58.

4) No testimony or records of where Plaintiff worked with specific barges and specific products, including loading and unloading $H_2S$ products, has been produced.

5) The Safety Management System full documentation has not been produced. See Plaintiff's Memorandum for Discovery Sanctions, at page 10, B. 2 and see RFP 30(b)(6) NOD at 7(a) and 7(b).

## IV.  PLAINTIFF'S SUBSTANTIVE REPLY

In the interest of simplifying the discovery dispute and focusing on specific malfeasance by MPC, Plaintiff re-examines the above five major topics, all previously addressed in Plaintiff's Motion for Sanctions and Memorandum in Support thereof, Doc. 58.

Defendant has not replied to why the above five areas of testimony and requested records have been totally evaded.  Instead, they make inane comments like "MPC's corporate representative witnesses were all well-prepared to testify on the topics for which they were tendered."  They make global statements without support in any verbatim quotes of testimony. Why would they do this? (Their reply memorandum, Doc. 65, at page 7, paragraph III).

Marathon is not excused from Rule 26 and Rule 30(b)(6), and had the duty to produce a person or persons with full corporate knowledge of the Topic, as the rule specifically requires:

"The persons designated must testify about information known or reasonably available to the organization. this paragraph 6 does not preclude a deposition by any other procedure allowed by these rules." See, Rule 30(b)(6) last paragraph.

Plaintiff proved in his original motion, and again will prove here, that the witnesses did not answer the Topic questions referred to in the motion for sanctions with **the information known or reasonably available to the organization**.

## V.  DISCUSSION OF MISSING DOCUMENTS AND MISSING TESTIMONY – 5 SUBJECT AREAS

**A.** **SUBJECT AREA 1:**
**NO INDUSTRIAL HYGIENE RECORDS WERE PRODUCED**
**NO TESTIMONY TO INDUSTRIAL HYGIENE STUDIES FOR MEASUREMENT OF LEVELS OF $H_2S$ ON BARGES OR DOCKS HAVE BEEN PRODUCED**

FACT: MPC produced Mr. Perdue, a person that is a Process Safety Coordinator that makes the following statements, speaking for MPC, under oath:

Relative to Industrial hygiene records:

Q: Okay. So the personal atmospheric monitoring would not be applicable to any particular employee because of any finding or characteristic of a physical examination to your understanding from "07 to '10 at the Catlettsburg refinery?

A: It would not be directly tied to any physical evaluation, no. It would be tied to perceived professional judgment and the established methodologies based on the job title or task.

"Q Okay, And so that would be standard sampling or monitoring of the employees to try to determine what particular agents they were being exposed to and what the risks were from that exposure, correct?

"A: That is correct." (Dep. Perdue 37:15-19.)

He stated the records exist. MPC produced no records. See RFP 30(b)(6) NOD at No. 15 (m), and mentioned in Exhibit 22 to Perdue's deposition.

Then, when asked if there was sampling or monitoring at the Catlettsburg refinery from '07 to '10 for hydrogen sulfide exposure, he answered:

"I would not be privy, not to my knowledge." (Dep. Perdue 37:3-24.)

Topic 38 covers MPC's interpretation of Industrial Hygiene data for not only VGO and Asphalt but for other $H_2S$ laden chemicals:

Part (c) of 38 of the 30(b)(6) NOD covers a request for IH data relative to:

"Any other products carried by YOU which Plaintiff may have been loading and unloading that carried $H_2S$."

No records were produced.

1). Mr. Perdue stated he is not privy to Catlettsburg refinery hydrogen sulfide records of exposure from '07 to '10. He testified Scott Jenkins would know this. (Dep. Perdue 37:20-25 and 38:1-9.)

Mr. Jenkins still works at MPC. He did not appear for testimony.

Mr. Perdue also testified that the MPC refining people had industrial hygienists that handled their duties *up to the interface with the marine division*, for loading and unloading tank barges, stating "I would agree with that." (Dep. Perdue 34:13-20.) These are relevant records asked to be produced.

No refining person with this knowledge was produced. No refining IH reports were produced. The 30(b)(6) NOD encompassed such document request at 30(b)(6) Topic IV, including subparts 38, 39 and 40 and RFP documents at No. 15, parts "m" and "o."

2). When asked who was the industrial hygienist at the North Bend Terminal (where Plaintiff became ill on May 26, 2012), Mr. Perdue said this was Steven Bourneois. (Dep. Perdue 39:5-8.)

Mr. Bourneois did not appear for testimony.

3). There is an industrial hygienist for the Garyville refinery and his name is unknown to Mr. Perdue. (Dep. Perdue 40:7-11.) Plaintiff worked almost two years straight in Louisiana from 2009 through June of 2010 loading and unloading VGO and Asphalt with $H_2S$ in it, some of which was at this terminal.

Mr. Bourneois did not appear for testimony.

4). Mr. Perdue alluded to personal atmospheric monitoring as part of "quantitative analysis of potential if any exposure to chemicals during routine works tasks." (Sic) (Dep. Perdue 40:22-25 and 41:1), and it includes hydrogen sulfide. When asked if this went to Mr. Jenkins he said,

> "I do not know that question-answer." (Dep. Perdue 41:7-14.) This violates 30(b)(6) topics 38, 38 a, b and c and 30(b)(6) RTP 15 parts "m" and "o."

5). Referring to Catlettsburg's plant, he said the "sampling methodology would've been the same across all the components. The same laboratory would've been used. Samples were kept in a database that OEH in Findley maintained." (Dep. Perdue 41:16-25 and 42:1.)

None were produced. This violates 30(b)(6) RTP "m" and "o."

6). Mr. Perdue admitted that to get this information it would come from Mr. Jenkins. (Dep. Perdue 43:6-10;) and, there would be similar data for Garyville, La. (Dep. Perdue 43:11-13.) Mr. Jenkins did not appear.

7). Mr. Perdue stated he was not familiar with the three-year time period from sample personal atmospheric monitoring in Garyville, Louisiana from '07 to '10. (Dep. Perdue 44:5-23.) This violates 30(b)(6) Topic 38 and subparts.

8). Mr. Perdue testified that third party labs were used during that time frame for sampling in Catlettsburg refinery from '07 to '10, and this was Bureau Veritas. (Dep. Perdue 43:14-19.) The client, MPC would have these reports. None were produced.

What office would have them from this company before 2010?

A: From 2007 to '10 I cannot tell you. I can tell you from 2010 on." (Dep. Perdue 43:23-25 and 44:1-4.) This violates 30(b)(6) RFP 15 "m" and "o."

9). He testified that at Garyville, if a 3rd party were not used, then MPC's industrial hygiene department would have monitored it, "It would have fell to the industrial hygienist to perform." (Dep. Perdue 44:21-25 and 45:1-3.) This violates 30(b)(6) RFP 15 "m," "n" and "o."

No records of 3rd party studies or MPC industrial hygiene studies were produced.

The above monitoring is inclusive in deposition Request to Produce "m," which says at page 21/22:

"All records containing $H_2S$ air monitoring, area monitoring, or personal monitoring conducted on the tug vessels as referenced in 9a) above and on the barges a referenced in (h) above, (or if none, then the tugs and barges YOU tested as exemplars).

"NOTE: Include all specific results in records concerning $H_2S$ monitoring on barges done by or for YOU while cargo is being loaded, unloaded, or

the barge is carrying or moving diesel, crude oil, VGO and/or asphalt, heavy crude slurry, or other oil products whose SDS or MSDS indicate the presence of $H_2S$.

This includes all IH surveillance and test records made by YOU or on YOUR behalf, including Industrial Hygiene contractors and consultants, and YOUR agents during the TIME FRAME."

<u>JAMES BROWN</u>

James Brown was produced as a corporate representative by Marathon.  He was first employed by Marathon in September 2012 well after Plaintiff's employment which ended May 26, 2012.  (Brown Dep. p. 5, line 8-9).  Prior to his employment at Marathon Brown worked as a tankerman for Kirby Inland Marine and provided shoreside tankerman services to Marathon.  (Brown Dep. p. 38, line 9-21).  As a contracted shoreside tankerman for Kirby Inland Marine Brown loaded and unloaded asphalt and VGO at Marathon's North Bend terminal where Plaintiff succumbed on May 26, 2012.  (Brown Dep. p. 39, line 3-7). Between 2002 and 2012 Brown unloaded asphalt and VGO at Marathon's North Bend terminal using forced air ventilation because of the presence of $H_2S$.  (Brown Dep. p. 48, line 1-8).  He does not know the number of times he worked as a contract shoreside tankerman at Marathon's North Bend terminal.  (Brown Dep. p. 39, line 13-15). None of these records have been produced.

Brown testified that he was "usually" advised by Kirby's dispatcher of the presence of $H_2S$ and the need to use supplied air.  (Brown Dep. p. 9, line 10-19).  No Kirby Inland Marine or other third-party contractor documents have ever been produced. Third-party contractor documents were requested in Plaintiff's 30(b) (6), RFP, item 15 "m," which includes all of the IH surveillance done by or for MPC, and it includes third parties. This is the request that MPC effectively ignored/suppressed, relative to all of the various data in IH that was shown to exist in Mr. Perdue's testimony, re: "sampling."

Brown testified that each barge had a "mailbox" that had loading and unloading procedures.  (Brown Dep. p. 28, line 14-15, p. 29 line 15-22.)  None of these documents have been produced.  Further, Brown testified that a procedure to test the barge for $H_2S$ while wearing forced air prior to any personnel coming on the barge was added to the Marine Loading and Unloading Procedures (Exhibit 4 to his deposition) in 2014.  (Brown Dep. p. 43, line 18 to p. 44, line 16).

Brown testified:

"A. Before they implemented these changes, Marathon didn't perform the transfers when it was over 10 parts per million.  They hired somebody to do it."

********************

Q.  All right.  And that is what let to you unloading high-sulfur asphalt at North Bend under the cascade forced-air system?

A.  Yes.

Q.  Prior to your going to Marathon in 2012?

A.  Yes." (Brown Dep. p. 64, line 8-22).

Kirby Inland Marine or other contractor documents showing call-outs of third party shoreside tankermen from November 2008 to May 2012 have never been produced.  Further, Brown's testimony confirms that barges were not tested prior to loading or unloading before 2014. This means sampling showed the presence of $H_2S$ was discovered to necessitate the use of a contract shore side tankerman under forced air. No records were produced.  Marathon has throughout discovery sought to limit its production to the Marathon "Marine Division," when they know shore-side Marathon persons did some or all of the monitoring. Dock manuals for shoreside dock operators procedures have not been produced.  Documents from third party

contract shoreside tankermen admittedly working in the presence of H$_2$S have not been produced. And no shoreside air monitoring results were produced.

<u>SCOTT PERDUE</u>

Scott Perdue was the Marathon Marine Division Industrial Hygienist beginning in 2010. He drew the "components" of Marathon which included Refineries and TT&M (Terminals, Transport & Marine) as they existed before 2010 (Exhibit 18 to his deposition) and after 2010 (Exhibit 19 to his deposition) when Marine became its own "component." Each "component" before and after 2010 had its own industrial hygienist (Perdue Dep. p. 17, line 20 to p. 18 line 6) that would also consult with corporate industrial hygiene's Office of Environmental Health (OEH) in Findlay, OH. Perdue testified that the industrial hygiene data gathered from 2006 to 2012 did not include shoreside industrial hygiene monitoring from refineries. (Perdue Dep. p. 268, line 16 to p. 269, line 22). These data from refineries was sent to OEH in Findlay, OH. (Perdue Dep. p. 91, line 5-9). OEH would also approve the Annual Air Sampling Plan from each "component," i.e. Refineries and Marine. (Perdue Dep. p. 91, line 5-9). None of the air monitoring results for shoreside personnel from refineries have been produced. No Annual Air Monitoring Sampling Plans from the Refinery or Marine Divisions have been produced. No third-party contractor information has been produced.

Perhaps most importantly Perdue testified that he reviewed a MPC wide incident-tracking database for all instances where personal H$_2$S monitoring alarmed for H$_2$S of over 10 ppm. (Ex. 22, Perdue Dep. p. 155, line 16 to p. 164, line 6). None of these incident reports have been produced. The names of third party tankerman and Marathon employees have been redacted. Plaintiff has no documentation from which to compare the chart constructed by Scott Perdue in response to Plaintiff's Second Request for Production to the actual facts. This Court should

order the production of all documents in the Marathon Incident Database resulting from $H_2S$ personal monitoring badges alarming (regardless of the cause or reason) from November 1, 2008 to May 31, 2012.

It is undisputed that Plaintiff was employed on the M/V ASHLAND from November 3, 2008 to August 1, 2010. David Earl confirmed that Plaintiff was working aboard a vessel on July 24, 2010. (Earl Dep. p. 140, line 20 to P. 141 line 21). The vessel could only be the M/V ASHLAND. Perdue testified that on July 24, 2010 in Garyville, Louisiana aboard the M/V ASHLAND there were three $H_2S$ alarms with peak readings of 19, 22 and 22 ppm. (Ex. 22). Perdue claims that Plaintiff's badge did not alarm but the names of the Marathon crew's badges that did alarm have been "redacted." (Perdue Dep. p. 164, line 7 to P. 165, line 25). Perdue admits that the incident report and witness statements, and other documents in the incident-tracking database would reflect what happened. None of these documents have been produced. The M/V ASHLAND worked in Louisiana primarily transporting asphalt and VGO to and from Marathon's Garyville refinery. This incident in Louisiana was not disclosed by Marathon prior to this case being transferred to this Court on grounds *forum non conveniens*.

Scott Perdue has admitted that exposure to $H_2S$ below established Occupational Exposure Limits (OEL) poses a risk of harm. (Perdue Dep. p. 33, line 9-19, p. 89 line 12 to P. 91 line 9). Perdue affirmed that Marathon's Marine Respiratory Protection Process requires any coworker leave the area when another coworkers $H_2S$ badge alarms due to shared risk of exposure. (Perdue Dep. p. 262 line 4 to p. 263 line 1).

This case would never have been transferred from Louisiana had Marathon disclosed the three high $H_2S$ alarms on July 24, 2010 in Garyville Louisiana aboard the M/V ASHLAND when the Plaintiff was admittedly aboard the vessel. And the incident report, witness statements and

vessel logs for that incident have never been produced. Even the Marathon employees' names have been "redacted." Moreover, Marathon represented to the court Plaintiff did not work many days in Louisiana, when in fact, he worked there nearly constantly for the time frame of November 8, 2008 through July 1, 2010. This was another act of dishonesty on Marathon's part. See Plaintiff Memorandum in Support of Sanctions, Doc. 58, Exhibit19.

**B.      SUBJECT AREA 2:**
**NO MEDICAL FOLLOW UP REGARDING MR. ADKINS WITH KNOWING HE HAD ANORMAL PULMONARY TEST SCORES**

FACT: Jennifer Boggs was identified as Senior Occupational Nurse. She works under Tina Thornton in Corporate Health Services. (Dep. Boggs 5:8-20).

She was tendered by MPC for Topics 8, 9, 12, 15, 21-29, 30, 32, 34, and 35.

Ms. Boggs states at page 33:6-7 that the "industrial hygiene" department determines if a worker is put into the respiratory program. No doctor's notes discussing Mr. Adkins' below normal Functional Vital Capacity were produced. See 30(b)(6) NOD at RFP No. 3. James Lavelle is a Physician's Assistant, not a medical doctor (M.D.)

Ms. Boggs was tendered to address Topics 8, 9, 21 and 34, all pertaining to examinations of Mr. Adkins, monitoring of Mr. Adkins, use of the health exam form 6056 for Mr. Adkins, how an employee is disqualified due to PVC (pulmonary vital capacity) and FEV1 (Forced Expiratory Volume 1) results, and Topic 34, for what records were relied on to allow Plaintiff to work despite his abnormal pulmonary test results. Topic 9 is precise on this point of inquiry.

She could answer none of it. Here are the facts:

SHE HAD NO EXPERIENCE BEFORE 2017 AT MARATHON

She had no experience with MPC until 2017 regarding the application of OSHA rules to MPC's respiratory program. (Dep. Boggs p. 33:13-17)

She had no previous experience with tankermen before 2017. (Dep. Boggs 33:21-23, p to 34:2.)

In Plaintiff's motion, page 34, Plaintiff identifies the request for any documents MPC has to justify Plaintiff's continued "fit for duty" status following each pulmonary test. These were not produced. (NOD document request 3, 6 subpart "o," and 13.) Not one record.

RE: NO KNOWLEDGE OF NEED FOR FOLLOW-UP EXAMINATION TO PULMONARY EXAMINATIONS

MPC's claim: "Boggs then testified regarding aspects of MPC's health monitoring and examinations protocols, respiratory examinations, how they applied to Adkins, which respiratory category Adkins fell into, and the nature of the examinations Adkins was to receive." (Reply brief at page 18, paragraph 3). This is not true for the following questions central to her topics:

Ms. Boggs was asked at Dep. p. 34:3-9 about the need for a follow-up examination if an employee has a positive response to questions 1-8 of the respiratory questionnaire.

Ms. Boggs evaded the question, and said OSHA had the same standard during the pertinent time period. This is non-responsive. Dep. Boggs p. 34:3-17, and then the questions was objected to.

She was next asked if she knew MPC had a policy during this time period with this alleged OSHA provision in it during the 8/1/08 to 6/1/12 period. (Re: What was the policy of having a follow-up medical clearance for men and women that have a low pulmonary study test result?) This is Topic 9 for which she was designated and also Topics 15 and 21 for which she was designated.

The question appears in Dep. Boggs 34:23-25.

Her response: "I haven't reviewed a policy before this one…" Dep. Boggs 35:1-3)

Under the case law for Rule 30(b)(6), this non-answer is equivalent to not appearing for the deposition.

WAS A FOLLOW-UP EXAM REQUIRED? YES OR NO? (Topics 15 and 21)

When pushed as to whether MPC required a follow-up examination if the seaman answered "yes" to questions 1-8, which pertain to asthma among other issues, (Dep. Boggs p. 35: 21-25 and p. 36:1), she admitted at page 36: 6-8, (over counsel's objection), as follows:

"So no. I haven't reviewed this procedure or policy." Dep. Boggs p. 36:7-8.

While defendant tendered her to answer topic questions at topics 8, 9, 12, 15, 21 and 34, among others, she was not prepared and could not have been prepared unless she spoke to someone with this knowledge. Instead of doing this, she testified the answer should come from industrial hygiene, stating:

"I CAN'T REALLY SPEAK TO IT- IT IS INDUSTRIAL HYGIENE"

"But again, this is an industrial hygiene policy, so I can't really speak to it." (Dep. Boggs 36:6-14).

Topic 9, her topic, is specifically focused on "Employee Health monitoring protocol" and the table on page 9/22 describes Respiratory Protection Requirements," Topic 15 and refers to what would disqualify the worker due to Pulmonary test results, i.e. PVC (Pulmonary Velocity Capacity and Forced Expiratory Velocity in 1 second, i.e. FEV1.)

Ms. Boggs could not answer questions about this subject:

"Q: Okay, and "here" being the policy we're looking at that's effective before then because it tracks the OSHA regulations, who were effective but you're not really sure if there was actually a policy in place to that extent or not?"

**A: Yes, I don't know." (Dep. Boggs p. 49: 16-24).**

(Defendant produced no industrial hygienist).

Perdue identified the industrial hygienist at MPC doing this work from 2007 through 2010 as Steven Boureois, who reported to Safety Supervisor George Shawver. (Perdue Dep. p. 28: 16-18, and p. 29:16-21.

These men were not tendered to testify.

Perdue was not designated to answer Topic 15, Ms. Boggs was:

> "What pulmonary PVC and FEV1 pulmonary results potentially disqualify an employee loading or unloading barges with asphalt, VGO or other hydrocarbons from wearing a respirator per YOUR PLHP (See Exhibit 1)."

Boggs, who said, ""But again, this is an industrial hygiene policy, so I can't really speak to it." (Dep. Boggs 36:6-14), was designated to answer this Topic.

See MPC's reply brief, page 3, paragraph 3, listing Topics 8, 9, 12, 15, 21-29, 30, 32, 34, and 35.

Topics 8, 9 and 12 were also directly on point, and part of Boggs designation.

BOGGS SAYS, "ITS INDUSTRIAL HYGIENE"

She argues at p. 36:15-24 that IH "owns the standards, so that's why it's in their policy."

No Industrial hygienist tendered to answer these questions?

No medical doctor was tendered. Ms. Boggs was required to come able to explain the answer for Topics 9 and 15, and to obtain the information from an informed source, like a controlling medical doctor. Rule 30(b)(6).

Another unanswered issue was:

"What is Marathon's policy with respect to workers and Industrial Hygiene policy per "Marathon Protection Requirements?" See Topic 9.

Ms. Boggs was tendered for Topic 9. Ms. Boggs did not answer the questions.

**C.**   **SUBJECT AREA 3:**
**MUST EMPLOYEES WEAR A SCBA WHEN OPENING HATCH COVERS?**

The first section the table included at page 9 of the notice of deposition, at page 9 of the

notice, says;

> "Employee(s)    Wears required respiratory protection based on the
> Employee Health Monitoring Protocol."

This MPC practices issue is found at Exhibit 9, Bates Adkins_001935 to Plaintiff's

Memorandum in Support of Sanctions.

When asked about this topic she said, "I can't really speak to it." (Dep. Boggs. 36:6-14.)

Defendant fails to address any of the above non-compliances with the notice in their reply

memorandum (Doc. 65.) Instead, they insist counsel asked the wrong questions and their

witness, including Ms. Boggs, were well-prepared.

**D.**   **SUBJECT AREA 4:**
**TESTIMONY OF MR. EARL RE: WHERE PLAINTIFF WORKED AND WHAT**
**PRODUCTS MR. ADKINS WAS EXPOSED - CANNOT ANSWER OR**
**PRODUCE RECORDS**

Marathon has stonewalled discovery regarding Plaintiff's exposure to $H_2S$ gas and other

hydrocarbons from the time of hire in November 2008 to when he was last employed on May 26,

2012.  At that time Plaintiff almost passed out and collapsed on the M/V GARYVILLE at

Marathon's North Bend, OH terminal facility while loading a tank barge and went to the hospital

never to return.  During this time frame Plaintiff's pulmonary function study results steadily

declined, yet Marathon repeatedly certified that Plaintiff could return to work unrestricted.

Marathon has represented that vessel logs which would reflect the vessel to which

Plaintiff was assigned and when that vessel loaded or unloaded asphalt or vacuum gas oil (VGO)

containing $H_2S$ were destroyed and are no longer available.  As Plaintiff was incapacitated while

employed as a tankerman aboard the M/V GARYVILLE on May 26, 2012 while loading VGO at Marathon's North Bend, OH terminal the case was transferred to this district under the maritime doctrine of *forum non conveniens*.

Marathon certified to the United States Coast Guard on January 25, 2011 that Plaintiff served as a deckhand aboard the M/V ASHLAND from November 3, 2008 to August 1, 2010 and the M/V SUPERAMERICA from August 1, 2010 to January 25, 2011. Subsequent documents from November 9, 2011 to May 24, 2012 (with the exception of vessel logs no longer available) also reflected Plaintiff's assignment to the M/V CINCINATTI, M/V GARYVILLE, M/V NASHVILLE and M/V TEXAS CITY. (Earl Dep. p. 122, line 19 to p.124, line 21, Ex.'s 6, 7, and 8). Comparing payroll records along with Plaintiff's safety training records Earl concluded that Plaintiff worked twenty to twenty-four hitches of twenty-eight days for Marathon during his three and one-half years of employment, or 160 to 192 days per year (roughly on half of each year).

During each 28-day hitch Plaintiff loaded and unloaded tank barges containing asphalt and VGO which emitted $H_2S$. Marathon provided in the Louisiana litigation a Barge History Report showing which barges were loaded and unloaded which was devoid of information as to which towing vessel accompanied which barge. Plaintiff has correlated this data to determine, (as best as possible), the degree of loading and unloading events during which Plaintiff was exposed to $H_2S$. Without vessel logs this was a daunting task.

<u>DAVID EARL</u>

On June 12, 2019, David Earl, Marine Operations Manager employed in the Marathon Marine Division since 2007, testified as a corporate representative that "product schedulers" in the Marine Division officed in Findlay, OH would formulate and send "work orders" directly to

the towing vessels setting forth the barges to be delivered in each tow, their destination and disposition. (Earl Dep. p. 18, line 1 to p.22 line 12). These work orders were communicated directly from Findlay, OH to each towing vessel, a/k/a tugs. (Earl Dep. p. 19, lines 11-12, p. 22, lines 4-5). Both vessel logs and product work orders would reflect what towing vessels attended each loading or unloading. These orders went directly to the vessels from product supervisors in Findlay, Ohio from 2007 throughout the Plaintiff's employment. (Earl Dep. p. 121, line 12 to p. 126, line 21). These documents have not been produced nor has Marathon's failure to produce these work orders been explained. Defendant has not stated they are destroyed. They are important to correlate $H_2S$ and other volatile aromatic hydrocarbon exposure.

Earl testified that Marathon's Marine Division has a Safety Management System (SMS) regularly audited by the American Waterways Operators (AWO) and Marathon is a member of AWO's Responsible Carrier Program (RPC). Plaintiff has requested these documents from the outset of this litigation. This SMS has existed since the beginning of Earl's employment with Marathon in 2007. (Earl Dep. p. 51, line 3 top. 57, line 24). Although Marathon represents that these documents have been produced in its hodge-podge production, Plaintiff has no way to ascertain what is missing. These documents are listed on the Marine Divisions "document portal" and should be produced, as they existed from November 2008 to May 2012. None of the AWO audits have been produced. They will show whether Marathon took corrective action and took root cause and ancillary cause investigation to Mr. Adkins on the job disability and injuries.

For instance, Ex. 4 to the Marathon FRCP Rule 30(b)(6) Dep. is the Marine Loading and Unloading Procedures (MPC Adkins 1923-1952) which is part of the SMS system. (Earl Dep. p. 58, line 1 top. 59, line 7). This policy, dated October 5, 2011 and approved by David Earl had undergone six (6) revisions prior to its production. Yet, none of these revisions have been

produced. Despite repeated protestations that tankerman James Brown, who was not even employed by Marathon until after May 26, 2012 (Adkins last day of work) would testify as to these revisions, and the documents have not been produced.

The Marine Loading and Unloading Procedures Policy (Ex. 4) notes specifically that it does not cover dockside transfer operations.

> "A. If our barge equipment was tendered into a dock, you have a – the Coast Guard requires you to have a dock operations manual that oversees the transfer." (Earl Dep. p. 64, lines 3-6).

Each facility has a dock operations manual. (Earl Dep. p. 64, lines 11-19). These documents have not been produced. In 2010 Marathon employed, for the first time, shore-based tankermen overseen by a tankerman services supervisor, Jason Crisp. Crisp worked for Marathon. (Earl Dep. p. 67, line 11 to p. 69, line 6).

> A. "Before [2010] we didn't have them. We used contractors or third parties." (Earl Dep. p.69, line 5-6).

This is important because James Brown testified that from 2010 forward, he, Brown, worked with forced air every time there was high $H_2S$ over 10 PPM. No records for these incidents have been produced. These records refute the defense that there was no high $H_2S$ where Plaintiff loaded and unloaded barges.

## E.     SUBJECT AREA 5:
## DEFENDANT HAS NOT PRODUCED THE SMS RECORDS REQUESTED

This topic was covered fully at page 10, item B 2) of Plaintiff's Memorandum in Support of Motion for Sanctions, Doc. 58, and was identified in Plaintiff's 30(b)(6) NOD at RFP 7a, 7b and 7c.

## VI. CONCLUSION

Marathon has sought to thwart and evade discovery since the beginning of the case in Louisiana and continues to this day in this Court. This is un-refuted by Marathon. There opposition did not address the five topics addressed in plaintiff's motion for sanctions.

This Court should:

1). Enter a default judgment against Marathon striking all defenses; and

determine what corporate officer and person told Mr. Massey "there are no additional documents to produce." See Conf. Tr. page 6, of June 11, 2019 Ex. 6 to original Memorandum for Sanctions, Doc. 58.

2). Or alternatively, bar any argument or proof by Marathon that plaintiff was fit for duty on barges carrying hydrocarbons after 3/25/10 when his Pulmonary Function Level was at or below 69%; and, bar any argument or proof that plaintiff was not caused to become ill and incapable of continuing to work on barges other than because of his work at Marathon; and, strike the use of the 142- page document produced by defendant as bates no's MPC-Adkins 10579 to 10720; and, strike the use of any IH samples or badge results produced to date by Marathon.

3). Or alternatively, this Court should impose sanctions, award attorney's fees and costs and order immediate production within seven (7) days of the following:

    (a) All Dock Loading manuals and associated documents, including all USCG inspections for Marathon facilities on the Intercostal Waterway, Mississippi and Ohio Rivers from Houston, TX to Ashland, KY from November 1, 2008 to May 31, 2012;

    (b) All documents from Marathon's incident tracking database pertaining to any $H_2S$ personal monitoring alarms from November 1, 2008 to May 31, 2012 specifically

including and all documents regarding the high $H_2S$ alarms reported on the M/V ASHLAND at Garyville, LA on July 24, 2010;

(c) All Annual "Sampling Plans" from Refineries and Marine from November 1, 2008 to May 31, 2012;

(d) All documents regarding air sampling done by Bureau Veritas for Marathon Refineries or Marine components from November 1, 2008 to May 31, 2012;

(e) All documents regarding the hiring of and identification of third party tankermen to provide shoreside tankerman services at Marathon facilities from November 1, 2008 to May 31, 2012.

(f) All Marathon "air sampling" and third "party sampling" performed to determine levels of hydrocarbons on its inland barge fleets carrying the products identified in plaintiff's motion at page 30;

(g) All of the missing requested documents listed in the Supplemental Memorandum and in this document at pages 9,10 and11;

(h) Marathon documents HES standard 415 Industrial Hygiene Exposure Assessment Program;

(i) Marathon document TNLHES008 Hydrogen Exposure Control Program;

(j) Marathon lab analysis of the content of the $H_2S$ in its oil products, including VGO, Asphalt and all HOT OIL BARGE transfer of products with any High Sulfur Products, and any heavy oil products;

(k) Order Depositions of Marathon's witnesses as follows:

i.   The refining witness from Marathon that sampled and documented the
hydrocarbon levels for interface with Marine loading and unloading of barges.
(Perdue depo. pg. 34:13-20);

ii.  The IH person for Marathon that worked at Garyville, La. sampling and recording
H2S levels for 2008-2010. (Perdue depo. pg. 40:7-11);

iii. Mr. Jenkins. (Perdue depo. pg 40:22-25 and pg. 41:1-14);

iv.  Mr. Steven Boureois, the Industrial Hygienist for MPC working from '07-'10 and
his boss, George Shawver. (Perdue depo. pg. 28:16-18 and p. 29:16-21);

v.   A medical director of Marathon Petroleum, L.P. to answer NOD Topic II. parts 7,
8, 9, 10, 15, 21, 22, 23, 24 and 25.

Respectfully submitted,

*/s/ S. Reed Morgan*
S. REED MORGAN
THE CARLSON LAW FIRM
Texas State Bar No: 14452300
100 E. Central Texas Expy
Killeen, TX 76541
Telephone: (800) 359-5690
Facsimile: (254) 526-8204
E-Mail: rmorgan@carlsonattorneys.com

FRANKLIN G. SHAW
La. Bar # 1594
LEGER AND SHAW
512 E. Boston Street
Covington, Louisiana 70433
P) 985-809-6625
F) 985-809-6626

AARON G DURDEN
10 West Monument Ave
Dayton, OH 45402
937-938-1182
agdlawyer@aol.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing pleading

has been served on all counsel of record via email this 6th day of August 2019.

Raymond L. Massey
Daniel Massey
The Massey Law Firm
Two City Place Drive
Suite 200
St. Louis, MO 63141
314-812-4888
Ray@themasseylawfirm.com
dan@themasseylawfirm.com

Grant S. Cowan
Maureen Bickley
Frost Brown Todd LLC
Great American Tower
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
(513) 651-6800
gcowan@fbtlaw.com
mbickley@fbtlaw.com

*/s/ S. Reed Morgan*