## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**BRENT A. ADKINS,**

       **Plaintiff,**

        **v.**

**MARATHON PETROLEUM
COMPANY LP,**

       **Defendant.**

                **Case No. 1:17-cv-643**
                **JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

This cause comes before the Court on Plaintiff Brent A. Adkins's and Defendant Marathon Petroleum Company LP's cross-Motions for Summary Judgment and accompanying motions to limit the testimony from various potential witnesses. For the reasons discussed below, the Court **DENIES** Adkins's Motion for Partial Summary Judgment (Docs. 130, 135). But the Court **GRANTS** Marathon Petroleum Company LP's Motion for Summary Judgment (Doc. 128) and **DISMISSES** Adkins's Second Amended Complaint (Doc. 18) **WITH PREJUDICE**. Accordingly, the Court **DENIES** all other pending Motions **AS MOOT**.

## BACKGROUND

### A. Factual History

Plaintiff Brent Adkins worked for Defendant Marathon Petroleum Company LP (Marathon) as a crew member on an inland river barge from 2008 to 2012. (Adkins Dep., Doc. 119, #7805). Specifically, he worked as a tankerman in the loading and unloading of vacuum gas oil (VGO), asphalt cement, and other oil-based substances.

(Pue Dep., Doc. 120, #8055). These substances emit hydrogen sulfide ($H_2S$) fumes. (*Id.*). Both parties agree $H_2S$ can have harmful, even deadly, effects when inhaled. The parties do not agree about what amount or concentration of inhalation will cause harm, what those harmful effects can look like, and whether Adkins's present symptoms are attributable to $H_2S$. These disagreements are the crux of the case.

Adkins suffered from childhood asthma. (*Id.* at #8181). He was prescribed medication but apparently stopped taking it. (*Id.*). Adkins now believes he only had asthma "for a couple months" as a child, apparently assuming he grew out of it. (Doc. 119, #7840). That said, prior to his work for Marathon, doctors had prescribed Adkins Advair and albuterol to help with his breathing. (*Id.* at #7835). He claims these medications were to treat his seasonal allergies and bronchitis. (*Id.*). In addition, while Adkins does not smoke, he suffers from obesity, which may affect his breathing. (Doc. 52-2, #1868; Doc. 120, #8110).

Before Marathon hired him in 2008, Adkins underwent a pre-employment physical examination. (Doc. 119, #7805). As part of the exam, a nurse tested Adkins's pulmonary function. (*Id.* at #7838–39). Adkins reported to the nurse he had a cold that day. (*Id.*). Following the testing, the nurse attested in the report "[m]ild restrictive pattern indicated." (Doc. 119-10, #7956). Also during his pre-employment screening, Adkins took a "functional capacity evaluation" to assess his ability to perform the job. (Doc. 119, #7840). As part of that evaluation, he reported working in environments that exposed him to dust and "cleaning chemicals." (Doc. 52-2, #1854). (Before and during his time working for Marathon, Adkins operated a window

2

cleaning business on his days off. (Doc. 119, #7800–01). Presumably, this is what exposed him to "cleaning chemicals.") Finally, he completed a respiratory questionnaire, which asked if Adkins had any previous pulmonary or lung problems. (*Id.* at #7840). Adkins answered "no" to both. (*Id.*). Based on these and other tests, Marathon cleared Adkins for the job.

Adkins underwent a similar evaluation in 2010. (*Id.* at #7841). He once again took a pulmonary function test. (*Id.*). Adkins remembers feeling "dizzy a little bit during the test." (*Id.*). Adkins reported to the nurse he had a history of bronchitis and mild seasonal allergies, as well as having previously worked in environments that exposed him to asbestos, tungsten/cobalt, and dust. (*Id.*; Doc. 52-4, #1876). But he again did not disclose his past diagnosis of asthma. (Doc. 52-4, #1875). Physicians cleared him to continue work. (*Id.* at #1877).

Although not explicitly disclosed during any physical with Marathon, Adkins suffered an episode of tachycardia in 2011. (Doc. 119, #7832). Tachycardia is a rapid and often irregular heart rhythm. As a result, a doctor (not affiliated with the Marathon physicals) prescribed him Metoprolol, a beta blocker that Adkins claims made him feel fatigued. (*Id.*).

Adkins underwent a third Marathon physical in 2012 around a month before his service at the company ended. (*Id.* at #7843). This exam followed much the same pattern as the prior two, except Adkins disclosed past diagnoses of asthma, pneumonia, and also checked the box for heart arrhythmia (which generally refers to an irregular heartbeat). (Doc. 119-12, #8009). The record is unclear whether Adkins

3

checked this box to refer to his tachycardia or for a different issue. In any event, an accompanying pulmonary function overview report concluded he suffered "[m]oderately severe restrictive pattern" in airflow. (*Id.* at #8012). Also during this exam, Adkins disclosed for the first time that his work exposed him to $H_2S$ fumes. (*Id.* at #8010).

Marathon knows its products can emit $H_2S$ fumes. It requires all company personnel working near the products to wear personal $H_2S$ monitor "badges." (Doc. 53-12, #2451). The badges alarm when detecting $H_2S$ at 10 parts per million (ppm). (*Id.* at #2453). Marathon's policy requires personnel to wear their badges near their mouths to detect $H_2S$ capable of being inhaled. (*Id.* at #2452). If a badge alarms, personnel must leave the area, notify a supervisor, and cease work until ordered otherwise. (*Id.* at #2453). There is some ambiguity in the record around what the OSHA regulatory limits and NIOSH guidance set as the occupational limit for short-term exposure to $H_2S$. Some citations suggest 15 ppm. (Doc. 53, #2146). Other places in the record suggest between 20 ppm and 50 ppm. (Doc. 120, #8044). In any event, all seemingly agree Marathon's $H_2S$ badges alarm below the standard OSHA and NIOSH short-term exposure limit.

The parties dispute whether Adkins's badge ever alarmed.[1] At one time, Adkins denied that his badge ever alerted for $H_2S$ while working for Marathon. (Doc. 53-15, #2471). Supporting that, there is no written record of Adkins's badge alarming.

---

[1] Adkins also attests he and other deckhands would occasionally cover their $H_2S$ badges to prevent them from alarming. (Doc. 123, #8653). There is no other evidence this occurred besides Adkins's word. If true, this would violate Marathon's policies. (*Id.*).

In his deposition, though, he claimed his badge alarmed five or six times, and he claimed to have informed the captain each time. (Doc. 119, #7816–17). Adkins never completed any written form detailing his badge alarming. He claims that he thought that was the captain's responsibility. (*Id.* at #7819). Marathon personnel, on the other hand, aver the deckhand is responsible for reporting such incidents. (Doc. 123, #8630). Consistent with the latter, discovery produced two other $H_2S$ badge alert reports from other deckhands that the ship's captain had not seen before. (*Id.*; Doc. 123-3; Doc. 123-4). And, as far as the Court can tell, discovery produced no instances of a captain submitting a report about a deckhand's badge alarming.

Relevant to this case, an "event" occurred on May 26, 2012. Adkins boarded Marathon's vessel, the M/V Garyville, on May 24, 2012, to begin a multi-week trip launching from the Cincinnati area. (Doc. 119, #7822). The first two days passed without incident, although Adkins claims he felt "not so good" later on the 25th. (*Id.* at #7824). Adkins later attested this was the first time he ever felt ill on a Marathon boat. (*Id.* at #7825). On May 26, Adkins started his work at 6:00 a.m., loading the barge with VGO. (*Id.*). He completed his first shift at 12:00 p.m., seemingly without incident. (*Id.*). The day was hot and sunny, around 93 degrees. (*Id.* at #7827).

Later in the day, Adkins prepared for his next shift, which started at 6:00 p.m. (*Id.* at #7826). Before starting, Adkins "calibrated" his $H_2S$ badge. (*Id.*). Then, some malfunction caused Adkins's badge to alarm. (*Id.*). Captain Jeremy Stewart ordered Adkins to swap badges with another crewman and start his shift. (*Id.*). Adkins believed this was a safety violation and complained, but Stewart ordered him to do

so anyway. (*Id.*). Wearing a fellow crewman's badge, Adkins then began his shift at the scheduled time. (*Id.*).

Around 7:30 p.m., Adkins fell ill. While opening a VGO valve, he suddenly felt light-headed and delirious, experiencing a headache and shortness of breath. (*Id.* at #7826–27). He describes the illness's onset as sudden and "in a hurry." (*Id.* at #7827). Adkins's badge did not alarm. (*Id.*). The $H_2S$ badges worn by nearby crewmen also did not alarm. (Doc. 123, #8651; Docs. 123-3). Adkins immediately left his post and went to tell a fellow crewmember he felt ill. (Doc. 119, #7827–28). The crewmember got Adkins a glass of water and let him cool off. (*Id.* at #7828). After cooling off and taking an Ibuprofen tablet, Adkins went to speak with Stewart. (*Id.*; Doc. 119-4, #7912).

After arrival, the two drafted a "Boatcrew Report of Injury or Illness" memorializing the incident. (Doc. 119-4). In the report, Adkins described the events and illness. He wrote, in full: "Opening [sic] valve and got light-headed and headache came, and also had shortness of breath and felt like tachycardia."[2] (*Id.* at #7912). Adkins signed the report. (*Id.*). Later, Adkins reported to Kristopher Perdue, another Marathon employee, that he had been wearing an $H_2S$ badge properly and confirmed it had not alarmed during the incident. (Doc. 53, #2158–59).

Adkins now tells a slightly different story of that interaction. In his deposition, Adkins claims he immediately suspected $H_2S$ fumes had caused his condition. (Doc. 119, #7828). And Adkins says he told Stewart his suspicions right away. (*Id.*). But

---

[2] As noted above, doctors had previously diagnosed Adkins with tachycardia, so he presumably knew what it felt like to suffer a tachycardic event.

$H_2S$ is mentioned nowhere in the report. Further, when questioned at his deposition, Adkins could not explain his suspicion beyond pointing to his four years' experience pumping barges. (*Id.*).

In any event, Stewart called for Adkins to be taken to a hospital, and a cab came to take Adkins to be evaluated. (*Id.* at #7830). Adkins reported his symptoms to the doctor, who ran blood work. (*Id.* at #7831–32; Doc. 119-5, #7917). The report noted his "chief complaint" as feeling "lightheaded." (Doc. 119-5, #7917). The doctor's report acknowledged Adkins had "a history of asthma" but also stated Adkins "[r]eveals easy respiratory effort without the use of accessory muscles. Auscultation is clear." (*Id.*). Under "diagnosis for discharge," the doctor wrote, "cardiac arrhythmia by history and heat intolerance." (*Id.* at #7918). Adkins also told the doctor he hadn't "felt good since [he] started on Metoprolol." (Doc. 119, #7832). The hospital discharged Adkins a few hours later. Adkins has not worked for Marathon since.

In the following months, Adkins saw a family physician and a pulmonologist. (Doc. 55-16, #2962). Unlike the doctor Adkins saw after leaving the barge, the pulmonologist diagnosed Adkins with toxic fume inhalation and prescribed him pulmonary medication. (*Id.*). Adkins's medical experts argue his lung capacity had deteriorated as compared to the pulmonary tests performed before the May 26th incident. (*See id.*). And at some point later on, doctors prescribed Adkins "more intense bronchodilator treatment and eventually supplemental oxygen." (*Id.* at #2963).

Claiming his injury had occurred on the boat, Adkins sought to have Marathon pay for his medical care under the maritime doctrine of maintenance and cure. (Doc. 52-9, #1939–40). Marathon refused, arguing his symptoms began before he boarded the ship, and told him to submit all bills to his private health care insurance. (*Id.*). But Marathon paid Adkins short-term sick pay benefits directly following the incident and has paid long-term disability benefits since. (Doc. 119, #7854–55).

In 2016, after this litigation began in Louisiana, Adkins saw Dr. Glenn Gomes. (Doc. 55-16, #2962). Adkins's counsel contacted and hired Gomes to see Adkins, but Adkins's counsel did not attend the first appointment. (Doc. 55, #2645). Gomes performed further pulmonary tests and found some slight improvement in Adkins's lung capacity from prior tests. (Doc. 55-16, #2962). But Gomes still reported a "pattern of mixed obstruction and restriction consistent with moderate to severe impairment of lung function." (*Id.*). At that first visit, Gomes did not report the cause of Adkins's injury. (*See* Doc. 55-9).

A few months later, Gomes met with Adkins again but with Adkins's counsel present. (Doc. 55, #2645–46). And this time, Gomes pinpointed a cause. He concluded $H_2S$ fumes had permanently injured Adkins's lungs. (Doc. 55-16, #2963). He also noted some improvement in lung function, which he attributed to therapy and removal from exposure to $H_2S$. (*Id.*). Finally, Gomes performed additional studies that found no evidence of pulmonary fibrosis or radiological abnormalities. (*Id.* at #2962).

At the time he initiated this litigation, Adkins claims he becomes fatigued after 10 to 15 minutes of activity and can no longer work. (Doc. 119, #7854). He says he uses supplemental oxygen most of the time. (*Id.* at #7853). When asked what out-of-pocket expenses he had incurred related to the injuries described in this case, he reported paying $800 in "prescriptions and stuff." (*Id.* at #7855).[3]

## B. Procedural History

The Court knows little about the first phase of this litigation. Apparently, Adkins first sued Marathon in Louisiana state court in 2015. (Doc. 1, #1–2; Doc. 8, #41–42). As noted, Adkins later met with Gomes on February 18, 2016. (Doc. 55-16, #2962). On August 17, 2016, Gomes drafted a letter detailing his review of Adkins's condition and his diagnosis and prognosis. (Doc. 55-16). In compiling that letter, Gomes attests to reviewing: (1) "Early medical history 2006-2012," (2) "Injury Report," (3) "Marathon company report and subsequent records,", and (4) "Various treatment records." (*Id.* at #2960). Gomes's letter does not cite any articles or studies to support his conclusions. The litigation continued until a Louisiana court determined this case would be better prosecuted closer to Adkins's home in Portsmouth, Ohio. Accordingly, the Louisiana court stayed the matter to permit Adkins to refile in the Southern District of Ohio. (Doc. 1-2).

Adkins filed his Complaint in this Court on September 27, 2017, (Doc. 1), then amended his Complaint on February 20, 2018, (Doc. 17), and amended again on

---

[3] Financially, Adkins relies on Social Security disability and long-term disability benefits from Marathon. (Doc. 119, #7854). Combined, Adkins currently receives approximately $1,950 monthly from these two sources. (*Id.*). And as noted, Marathon also paid Adkins short-term sick pay benefits for some period of time after the May 26 incident. (*Id.* at #7855).

February 21, 2018, (Doc. 18). In his Second Amended Complaint, Adkins pursues three causes of action: the Jones Act, unseaworthiness, and maintenance and cure. (*Id.* at #346–54). The crux of Adkins's allegations is that, while serving on Marathon's barge, Adkins experienced cumulative, low-level exposure to $H_2S$ fumes, and that this aggregate low-level exposure caused permanent damage to his respiratory system. (*Id.* at #335, 344–35).

The parties engaged in discovery. The Court issued an initial scheduling order, with Adkins's primary expert disclosures due by February 1, 2019, Marathon's primary expert disclosures due by April 1, 2019, and a final discovery deadline (including expert discovery) of May 30, 2019. (Scheduling Ord. 6/22/18). After the parties requested extensions, the Court reset Adkins's expert disclosures for March 6, 2019, and the discovery deadline for July 15, 2019. (Not. Order 03/04/19; Doc. 40).

As part of working up the case, the parties engaged experts and undertook extensive discovery as to each other's experts. Adkins disclosed multiple experts, along with Adkins's "treating physician" Dr. Gomes. First, Adkins hired Dr. Sheila Butler, who opined regarding Marathon's health and safety standards. (Doc. 118-9, #7657). At her deposition, though, Butler made clear she was not opining as to medical causation—i.e., whether or how $H_2S$ caused Adkins's present symptoms. (Doc. 118, #7529). Second, Adkins retained Dr. Rachel Jones, who offered an opinion as to Adkins's approximated overall cumulative exposure to $H_2S$. (Doc. 117-4, #7499–500). Again, though, Jones did not discuss whether (or how) cumulative $H_2S$ exposure causes injury.

Third, and more relevant to this Opinion, Adkins hired Dr. Charles Pue. (Doc. 120). Like Gomes, Pue reached an opinion concerning medical causation, and he provided two reports disclosing that opinion. (Docs. 120-9; 120-20). In his first report, timely disclosed on March 1, 2019, Pue argued Adkins suffered from a "[c]hronic respiratory condition due to the inhalation of" $H_2S$ fumes. (Doc. 120-9, #8256). Citing the temporal relationship between his exposure and the onset of his symptoms, Pue concluded Adkins's "asthma was aggravated by exposure to $H_2S$ gases, fumes, and vapors" and that such aggravation is now permanent. (*Id.*). Pue noted in the report that Gomes had characterized Adkins's exposure to $H_2S$ fumes as "chronic." (*Id.* at #8252). But beyond noting that, Pue said nothing about the $H_2S$ concentrations that are required to cause injury, whether he contends that $H_2S$ exposure is cumulative, or the physiological mechanism by which the asthma aggravation allegedly occurs.

Then on October 4, 2020, over eighteen months after the revised deadline for expert disclosures had passed, Pue issued a supplemental report. (*See* Doc. 120-20; Not. Order 03/04/19). He did so without leave from the Court and mere days before his October 8 deposition.[4] (*See* Doc. 120). In that supplemental report, Pue examined additional incident reports and a deposition of a crewmember before reaffirming his original medical causation theory. (Doc. 120-20, #8419–20). Again, though, beyond asserting that the $H_2S$ gases caused Adkins's pulmonary injury, Pue still provides no discussion of the details surrounding that.

---

[4] Marathon objects to the consideration of this report because Pue issued the supplemental report after the deadline.

More than that, neither of Pue's two reports identified any articles, studies, or other outside sources as direct support for his claim that $H_2S$ exposure can aggravate asthma. True, both reports include an appendix, listing various articles. But neither report explains how, or even whether, those articles support his opinion regarding causation. (Doc. 120-9, #8258; Doc. 120-20, #8422).

Finally, Adkins offers Gomes as a testifying, non-retained, treating physician. As discussed, Gomes prepared a four-page letter which contains his medical causation opinion. (Doc. 55-16, #2960–63). But his letter too does not cite any scientific studies, peer-reviewed articles, or similar sources to support his opinion.

Marathon, for its part, engaged experts as well. Relevant to medical causation, Marathon's experts disagreed with Adkins's cumulative exposure theory. After surveying the literature, Marathon's experts concluded: "There is no indication that repeated $H_2S$ exposure at low concentrations is capable of causing or contributing to any pulmonary disease or respiratory injury." (Doc. 115-6, #6818). According to these experts: "$H_2S$ is not a cumulative or stored toxicant" and is "only known to cause temporary symptoms" such as "loss of consciousness, asphyxiation, and death (if not removed from the area) due to exposure to high concentrations." (*Id.*). The expert report also cited studies purporting to show a lack of pulmonary effect from repeated, low-level exposures. (*Id.* at #6838–39).[5]

---

[5] Adkins argues these expert opinions are inadmissible under Rule 702 and *Daubert*. (*See* Doc. 136). The Court does not reach the admissibility of Marathon's experts' opinions though. As discussed below, Adkins has failed to provide his own admissible evidence for an issue on which he bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). That failure means Adkins loses on summary judgment, independent of whether Marathon has any admissible evidence to the contrary on this issue. *Id.*

12

### C.     Cross-Motions For Summary Judgment

On June 30, 2021, both parties moved for summary judgment. Marathon sought judgment in its favor as to all of Adkins's claims. (Doc. 128). Relevant here, Marathon argued Adkins had not carried his burden of creating a genuine dispute whether (1) long-term, low-level $H_2S$ exposure *can* cause symptoms like those seen in Adkins (general causation), or (2) the $H_2S$ exposure here *did* cause Adkins's symptoms (specific causation). (Doc. 128-1, #8863–67). Marathon said each of Adkins's experts is incapable of reliably testifying as to these two issues—dooming Adkins's Jones Act and unseaworthiness claims. (*See id.*). Finally, Marathon's argument on maintenance and cure did not expressly invoke the word "causation," but the ultimate effect was the same. Marathon argued the claim failed because any symptoms attributable to his service on the barge—e.g., lightheadedness, dizziness—resolved with rest and cooling off. (*Id.* at #8868). In other words, Marathon contends that no evidence shows that Adkins's present injury (loss of pulmonary function) arises from, or relates to, his service on the boat.

Accompanying this Motion, Marathon filed four Motions to Strike or Limit Testimony, one for each of Adkins's deposed experts: Gomes (Doc. 124), Butler (Doc. 125), Jones (Doc. 126), and Pue (Doc. 127).

For his part, Adkins moved for partial summary judgment on his cure claim. (Docs. 130; 135). (Adkins seems to have filed two parallel Motions for Partial Summary Judgment, but the second is merely an enhanced version of the first.) Emphasizing the claim's strict liability nature, Adkins argued that all he need show is that he became sick while aboard Marathon's barge. (Doc. 135, #9234–35). Finally,

13

Adkins too sought to limit the testimony of Marathon's proposed experts and other proposed witnesses. (Doc. 136). As part of that, Adkins asked to submit a USB drive containing information relevant to his cross-examination of one of Marathon's proposed witnesses. (Doc. 134).

After reviewing the record and the parties' various motions, the Court determined that general causation was a key issue in the case. Specifically, the parties dispute whether Adkins has provided sufficient evidence from which a jury could conclude that repeated, low-level exposure to $H_2S$ fumes, akin to what Adkins allegedly suffered here, *can* cause respiratory injury. After reviewing Adkins's expert disclosures, the Court believed Pue likely came closest to reliably providing that testimony. Accordingly, the Court held a *Daubert* hearing to assess whether Pue's expert testimony would be admissible at trial with regard to general causation. (Docs. 161, 162). The specifics of Pue's testimony there are discussed as relevant below.

All matters are now fully briefed and ripe for ruling.

## STANDARD OF REVIEW

Both parties seek summary judgment (although on Adkins's part, it is only partial summary judgment). For either to prevail, they "bear[] the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). This can include, for example, the moving party showing that the

14

nonmoving party lacks evidence on an issue on which the nonmoving party bears the burden of proof. *Celotex*, 477 U.S. at 325; *Clark v. Walgreen Co.*, 424 F. App'x 467, 471 (6th Cir. 2011).

Once the moving party has met this "initial responsibility," the nonmoving party cannot defeat summary judgment merely by pointing to *any* factual dispute. Indeed, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). That is, the dispute must be both "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e., a fact that could change the outcome).

In sum, after reviewing all the cited evidence, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). And in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

15

## LAW AND ANALYSIS

Adkins asserts three causes of action under maritime law seeking recovery for injuries he allegedly suffered from exposure to $H_2S$ while aboard Marathon's vessel. While each cause of action has somewhat differing elements, all fail for the same reason. Each requires proof of a causal link between the $H_2S$ exposure and Adkins's alleged injuries. But Adkins has not provided admissible evidence to establish that link. That is largely because his medical causation experts—Pue and Gomes—did not comply with the Federal Rules of Civil Procedure in disclosing their opinions. Whatever the reason for the shortcoming, though, without causation evidence to support his claims, a reasonable jury could not find in his favor.

**A.    All Three Claims Require Adkins To Show That The Exposure To $H_2S$ Both Can Caused And Did Cause His Alleged Pulmonary Injuries.**

As noted, Adkins is pursuing three causes of action under maritime law: (1) the Jones Act, (2) unseaworthiness, and (3) maintenance and cure. (Doc. 18, #346–54). Based on the theories that Adkins is advancing here, each claim requires a showing of causation for him to recover.

### 1.    The Jones Act

The Jones Act codifies a negligence-based cause of action for a seaman to bring against his or her employer. *See* 46 U.S.C. § 30104. Like other negligence claims, a seaman must demonstrate duty, breach, causation, and damages. *See Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001). That said, the Jones Act employs a "reduced standard for causation between the employer's negligence and the employee's injury." *Id.* "Under the Jones Act, a plaintiff need only show that

the defendant's negligence, however slight, contributed in some way toward causing the plaintiff's injuries." *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1463 (6th Cir. 1993).

Here, Adkins is claiming an entitlement to relief based on his reduced lung function, which he says results from $H_2S$ exposure on the Marathon vessel. Thus, to succeed on this claim, he must show a causal relation between that exposure and his current injuries—i.e., that the exposure "contributed in some way" to that injury.

### 2. Unseaworthiness

Unseaworthiness, by contrast, is a federal common law claim. Under this doctrine, "[a] ship owner is strictly liable for personal injuries caused by his or her vessel's 'unseaworthiness.'" *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960)). "A vessel is unseaworthy if the vessel and its appurtenances are not 'reasonably fit for their intended use.'" *Id.* But as that suggests, unseaworthiness too has a causation element. "A plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Miller*, 989 F.2d at 1463 (quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)).

Thus, just as with the Jones Act claim, to succeed on his unseaworthiness claims, Adkins again must show a causal link between the $H_2S$ exposure and the injuries for which he is seeking relief.

17

### 3. Maintenance and Cure

That leaves maintenance and cure—the ancient maritime remedy. *See The Osceola*, 189 U.S. 158, 175 (1903). Maintenance describes a shipowner's duty to provide a seaman food and lodging. *Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 761 (6th Cir. 2009). Cure, on the other hand, describes a shipowner's duty to provide medical care "during the period of injury or illness." *Id.* As a strict liability regime for the benefit of the seaman, ambiguities are resolved in the seaman's favor. *See Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). To prevail, a claimant must show "(1) he was working as a seaman, (2) he became ill or injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *West v. Midland Enters., Inc.*, 227 F.3d 613, 616 (6th Cir. 2000).

The "lost wages" in the third element refers to compensation that the seaman would have otherwise earned over the course of their employment contract without the injury. *Blainey v. Am. S.S. Co.*, 990 F.2d 885, 891 (6th Cir. 1993). Here, Adkins has not claimed—nor does the record detail—any such lost wages. (*See* Doc. 18, #353–54; Doc. 157, #9802). Thus, his only way of showing the third element is with expenses. And in these circumstances, maintenance and cure only permits a seaman to recover his or her *actual* out-of-pocket expenses. *See Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 588 (6th Cir. 1989); *Shaw v. Ohio River Co.*, 526 F.2d 193, 200 (3d Cir. 1975). On that front, the only out-of-pocket expenses the record reflects are $800 in expenses that Adkins incurred for "prescriptions and stuff." (Doc. 119, #7855).

Causation is not per se an element of maintenance and cure. *Messier v. Bouchard Transp.*, 688 F.3d 78, 83–84 (2d Cir. 2012) ("The rule of maintenance and

cure is simple and broad: a seaman is entitled to maintenance and cure for any injury or illness that occurs or becomes aggravated while he is serving the ship."); *Ramirez v. Carolina Dream, Inc.*, 760 F.3d 119, 124 (1st Cir. 2014). But where an injury manifests *after* a seaman has left his service, causation plays a limited role. Specifically, the seaman must show that the later-arising injury—and accompanying expenses—arise from the seaman's service. *See Messier*, 688 F.3d at 85; *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 53 (2d Cir. 2004); *Prendis v. Cent. Gulf S.S. Co.*, 330 F.2d 893, 896 (4th Cir. 1963).

So although causation is not normally part of maintenance and cure, Adkins nonetheless must prove here that his claimed out-of-pocket expenses related to an injury that occurred or was aggravated while he served on the barge. And, based on Adkins's theory, that means he must show that his cumulative, low-level exposure to $H_2S$ fumes caused or worsened his pulmonary injury, which in turn required him to spend that $800.

In sum, each of Adkins's claims requires some showing of causation.[6]

---

[6] Granted, Adkins vigorously disputes that causation has any bearing on his cure claim. (Doc. 157, #9801–02). And as discussed, that is normally true—particularly when the injury and out-of-pocket medical expenses are obviously related to a seaman's service. But here, what expenses are "related" is not obvious but rather hotly disputed. Indeed, Marathon proffers experts who say the body of medical research does not support that $H_2S$ *even could have* caused or aggravated Adkins's present injury. Thus, Adkins's burden as plaintiff requires he provide at least some affirmative evidence tracing his present injury and accompanying expenses to his service with Marathon. *See Prendis*, 330 F.2d at 896 ("Even though the right of recovery for maintenance and cure is quite broad, the [seaman] still bears the burden of alleging and proving facts that bring himself within its scope.").

### 4. General And Specific Causation

As this is a toxic tort case, establishing causation requires two showings: general causation and specific causation. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676–77 (6th Cir. 2011). General causation means "the toxic substance is *capable* of causing" injuries of the type at issue. *Id.* (emphasis added). Specific causation, by contrast, means the toxic substance in fact "did cause [] the plaintiff's alleged injury." *Id.* In cases like this one, proving either requires expert testimony. *Id.* ("Both causation inquiries involve scientific assessments that must be established through the testimony of a medical expert."); *see also Wills*, 379 F.3d at 46 ("Where … the nexus between the injury and the alleged cause would not be obvious to the lay juror, '[e]xpert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.'" (quoting *Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987))). And if those experts who would otherwise demonstrate general or specific causation are excluded, "a plaintiff's toxic tort claim will fail." *Pluck,* 640 F.3d at 677 (quoting *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. Ohio 2010)). Maritime law cases are no different. *See Wills*, 379 F.3d at 46.

### B. Adkins Lacks Admissible Evidence Sufficient To Create A Genuine Dispute As To General Causation Or Specific Causation.

As the movant for summary judgment, Marathon bears the initial burden to show there is no genuine issue of material fact that Adkins cannot prevail on his three claims. As already noted, Marathon can discharge this burden by showing Adkins lacks evidence necessary to prove his case. Pursuing that avenue here, Marathon says

Adkins's proposed experts cannot offer admissible testimony that would create a genuine dispute on medical causation. And absent a genuine dispute as to causation, Marathon asserts, all Adkins's claims fail.

Adkins disagrees. That is, he believes his experts—Pue and Gomes specifically—are admissible and can adequately testify on both general and specific causation. (*See* Doc. 32). And in Adkins's view, their testimony creates a genuine issue of material fact sufficient to survive summary judgment.

In short, then, this dispute comes down to admissibility. If Adkins is to create a genuine issue of material fact, either Pue or Gomes, or both together, must have admissible testimony to create a genuine dispute of material fact on both general and specific causation. Measured against that standard, Adkins falls short. Indeed, as discussed below, neither expert has offered admissible opinion testimony as to *either* general or specific causation.

### 1.    Pue Cannot Testify As To Causation.

The decision to admit an expert opinion has both a procedural element and a substantive element. As to procedure, the proffering party must disclose any opinion that an expert intends to offer at trial in accordance with the Federal Rules of Civil Procedure. Then, as a matter of substance, that opinion also must meet reliability standards. Here, Pue's general causation opinion has problems on both fronts.

Start with the former. At the *Daubert* hearing, Pue made clear that the opinion he now intends to present at trial is that repeated low-level exposure to $H_2S$ fumes (actually, to any irritant) can cause "airway remodeling" that, especially for

asthmatics, may cause permanent injury to pulmonary function. (Doc. 162, #9967–68). But he never disclosed that opinion, nor anything like it, in his original report. In fact, exactly what his opinion is on the mechanism of causation has been somewhat of a moving target. But one thing is clear—his first mention of airway remodeling occurred in response to the Court's questioning at a *Daubert* hearing a few months ago, some *eight years* after this litigation began in state court and nearly *four years* after expert discovery closed in federal court. And the *sources* on which he relies to support his opinions likewise have constantly evolved.

That is not how expert discovery works. Parties are required to disclose an expert's opinions and the bases for them in their reports. As explained more fully below, given Pue's failure to timely disclose large parts of his proposed testimony, the Court will limit Pue to the opinions and sources disclosed in his initial report.

But that leads to the second problem. As a substantive matter, Pue did not sufficiently disclose in that initial report any opinion about the effects continuous low-level exposure to $H_2S$ fumes can have on pre-existing asthma. And even if he had, the sources in his report do not provide a reliable basis for him to opine that such exposure causes pulmonary injury to people with pre-existing asthma. Accordingly, that opinion is inadmissible. As a result, Pue cannot create a genuine dispute on general causation.

Finally, Pue has not provided an admissible specific causation opinion either. While he claims to have relied on Gomes's differential diagnosis as a basis, that isn't enough for Pue to state his *own* opinion on specific causation.

### a. *Pue did not disclose his general causation opinion in accordance with the Federal Rules.*

The Federal Rules of Civil Procedure set ground rules for discovery and trial preparation. "The purpose of our modern discovery procedure is to narrow the issues, to eliminate surprise, and to achieve substantial justice." *Greyhound Lines, Inc. v. Miller*, 402 F.2d 134, 143 (8th Cir. 1968); *see also Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966) ("The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush.").

In the context of experts, the Rules achieve this end by requiring experts to prepare written reports to be disclosed to the opposing side. Fed. R. Civ. P. 26(a)(2)(B). The report must include:

(i)      a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)      the facts or data considered by the witness in forming them;

(iii)      any exhibits that will be used to summarize or support them;

(iv)      the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)      a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)      a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi). "[A] 'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.'" *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)). In other words, "[e]xpert

reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." Fed. R. Civ. P. 26(a)(2) advisory committee's note to 1993 amendment.

A report is deficient when it shows a "lack or reasoning," provides "only cursory support," or is "sketchy, vague or preliminary in nature." *R.C. Olmstead*, 606 F.3d at 271; *Salgado*, 150 F.3d at 741 n.6; *see also Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) (noting a report with an "absence of meaningful analysis and reasoning" is deficient). And later disclosing an opinion's "how and why" in a deposition generally cannot cure a deficient expert report. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony. … [The Rule's] purpose would be completely undermined if the parties were allowed to cure deficient [expert] reports with later deposition testimony."); *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 215–18 (4th Cir. 2017) (Wynn, J., concurring).

To be certain, Rule 26 "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation."). This elaboration can include discussion of the "normal general standards" known to all members of a profession. *Id.*

But "elaboration" has its limits. For example, a reference to entirely new bases of support undisclosed by the report crosses a line. *See White v. Woodside*, No. 20-

24

11543, 2022 WL 1123782, at *2 (E.D. Mich. Apr. 14, 2022); *Smith v. Pfizer Inc.*, No. 3:05-0444, 2010 WL 1963379, at *9 (M.D. Tenn. May 14, 2010).

Now apply that framework to Pue's disclosures here. From March 1, 2019, when he issued his first report, until November 8, 2022, the second day of the *Daubert* hearing, Pue's opinion on general causation has markedly evolved. Not only that, but he has repeatedly augmented the bases he claims to have relied on in reaching his opinion. Simply put, neither his initial report, nor any updated report, provide any meaningful hint as to his current proposed testimony on general causation.

Start with his actual reports. He filed his initial report on March 1, 2019. There, Pue's entire causation theory can be summarized as follows: Adkins suffered a permanent, chronic respiratory condition from the aggravation of his childhood asthma caused by, and with temporal relationship to, his inhalation of $H_2S$ fumes. (Doc. 120-9, #8256). That's it. Pue does not even try to explain how or why $H_2S$ fumes caused Adkins's injury, what the physiological mechanism of injury was, what concentrations would cause such injury, or anything of the sort. And the only support he cites in that report is (1) a Material Safety Data Sheet for $H_2S$ and (2) an Appendix citing seven articles, including the Hessel article (which the Court discusses further below). (*Id.* at #8253, 8258). Even as to those sources, the report never explains how they support Pue's opinion.

A year and a half later, on October 4, 2020, Pue filed an untimely supplemental report. There, he cited three additional sources and echoed the same bare-bones causation conclusions. (Doc. 120-20, #8422). The supplemental report once more did

not explain how continuous exposure to low-level $H_2S$ fumes could cause or aggregate a pulmonary injury. And here again, Pue does not connect the sources he cites to the opinion he offers.

Perhaps recognizing these shortcomings in causation, Pue took another stab at it. Just before his deposition on October 8—a year-and-a-half after the expert disclosure deadline and four days after issuing his supplemental report—Pue provided Marathon's counsel with a packet of additional articles not previously disclosed. (Doc. 120, #8032). When Marathon's counsel asked about these new articles at the deposition, Pue replied: "I provided some articles when I wrote my original report in 2019. And then I provided additional articles as the case progressed. As I got more information, I provided additional articles as I reviewed the—the records." (*Id.*). Perhaps confused, Marathon's counsel inquired: "So there are specific articles that are cited in your report. Are you saying that you did not cite to all of the articles that you actually relied on?" (*Id.*). Pue responded:

> I cited to specific articles in my report that were pertinent to certain points that I wanted to make at that time. I also provided additional articles to [Marathon's counsel] to share with you because I felt they were pertinent and would be pertinent for this deposition, so *I relied upon all of those articles that I provided*.

(*Id.* (emphasis added)).

As the discussion turned to the articles supporting his causation opinion, Pue then invoked, for the first time, an article that Jappinen authored and one that Guidotti authored. (*Id.* at #8053; Doc. 120-7; Doc. 112-11). The Hessel article, which Pue had disclosed in his initial report, cited Jappinen. But Pue did not reference or discuss Jappinen in either his initial or supplemental reports. As for Guidotti,

26

Marathon's expert, Dr. Paul Nony, had relied on the Guidotti article to show a *lack* of any causal connection. (Doc. 112-1, #5846). Whether Nony brought Guidotti to Pue's attention or not, one thing is certain—Pue's reports never referred to Guidotti as a basis for *his* opinion.

Pue also testified at his deposition, again for the first time, about his prior experience as a clinical pulmonologist working with patients exposed to $H_2S$ on hog farms and paper mills. (Doc. 120, #8039). He explained how this experience created yet another independent basis for his general causation opinion. (*Id.* at #8042, 8045). Nothing in Pue's CV showed any previous experience working with patients exposed to $H_2S$. (*See* Doc. 120-1).

Marathon's counsel then asked Pue whether he had a familiarity with the OSHA/NIOSH standards for workplace exposure to $H_2S$. (Doc. 120, #8044). Pue attested that he recalled the limit was 20 ppm for an eight-hour workday exposure. (*Id.*). The parties then broke for lunch (*id.* at #8047), during which Pue apparently conducted additional research on that question. (*Id.* at #8053). Following the break, Pue revealed that he double-checked the OSHA website to confirm his recollection. (*Id.*). But that wasn't all. Pue then volunteered:

> But on the OSHA page, it says that the ACGIH, which is the American College of Governmental Industrial Hygienists, they have actually listed the eight-hour time weighted average for H2S as one part per million. And the [short-term exposure limit] is five parts per million, which is significantly lower than what OSHA had listed. So there's other organizations that feel that low levels are potentially dangerous, not just my interpretation of the literature.

(*Id.*). In other words, Pue located another new, previously undisclosed source as alleged support for his opinion. But, when Marathon's counsel inquired whether the

ACGIH explained its recommendations, Pue admitted he did not know and had not investigated further. (*Id.*).

Still, Pue wasn't done discussing the OSHA website. Later on in the deposition, Pue claimed that while on the OSHA website, he saw a report that an asthmatic may suffer bronchoconstriction at $H_2S$ concentrations of two to five ppm. (*Id.* at #8115–16, 8151, 8176–77). This "two to five ppm" OSHA recommendation that he (apparently) discovered mid-deposition—and more than a year after his expert report—has since become central to Pue's general causation opinion. (*See* 11/8/22 Hrg. Trans., Doc. 161, #9828; 11/18/22 Hrg. Trans., Doc. 162, #9927, 9963). Yet none of this information— the "two to five ppm" recommendation, the OSHA website, and the ACGIH recommendation—appeared in Pue's reports. And Adkins's counsel did not provide this source or its contents to Marathon's counsel ahead of Pue's deposition, causing Marathon to later object to any consideration of them. (*See* Doc. 161, #9828–32, 9855).

Then, on the second day of his deposition, Pue revealed another previously undisclosed basis for his opinion. As the deposition began, Pue volunteered that he had conducted yet more research overnight and located guidelines from the American Thoracic Society (ATS). (Doc. 120, #8084–85). He argued these guidelines "[r]eally didn't do anything to change any of [his] opinions," but still offered them as a basis for his general causation opinion. (*Id.*). Pue stated he had read the guidelines "in the past," making it "part of [his] knowledge bases that [he] used in preparing his report." (*Id.* at #8089). Taken aback, counsel for Marathon put on the record: "I'm going to tell you that I just received that earlier today and haven't had an opportunity to really

review it in any—any depth other than to kind of read the overview on here." (*Id.* at #8087).

Aside from inquiring into sources, counsel for Marathon also asked Pue at his deposition to describe what $H_2S$ fumes do to the human body. (*Id.* at #8053). Pue explained that $H_2S$ interacts with smooth muscles in the body, such as the airways, to relax them. (*Id.* at #8053–54). When asked, he disclaimed knowing how the body metabolizes and removes $H_2S$. (*Id.* at #8054). Beyond that, Pue provided no further explanation about how $H_2S$ interacts with the body—certainly nothing about "airway remodeling."

Fast forward to the *Daubert* hearing. When questioned about the basis for his opinion that cumulative, low-level exposure to $H_2S$ fumes can cause pulmonary injury, at least to asthmatics, Pue cited to the Jappinen, Hessel, Guidotti articles, the ATS guidelines, the "two to five ppm" recommendation from the OSHA website, and his personal experience. (Doc. 162, #9926–27).

But even then, Pue was not done revealing new bases for his opinion. At the hearing, he described for the first time an article by Richardson, which traced sewer workers who had been exposed to low levels of $H_2S$ on the job. (Doc. 161, #9898–99). Marathon's counsel responded by "object[ing] to any reliance by Pue or the Court … with respect to the Richardson article" because "[i]t was not referenced in either of Pue's expert reports, his deposition, or in the year since then." (*Id.* at #9899). Pue defended his discussion of the article, confirming he *had* relied on this article when

29

forming his general causation opinion in his reports (albeit apparently failing to disclose that fact). (*Id.*).

Second, Pue pointed to two "animal studies," Lopez and Holbert, as further bases for his opinion.[7] (*Id.* at #9834–35). When asked by Marathon's counsel, Pue claimed he could rely on these studies because "they are references within the references I provided." (Doc. 162, #9957–58). In other words, the articles he had cited in turn cited to the animal studies.

The Court expressed concern about what appeared to be shifting bases for Pue's opinion. After Pue began to testify as to the "two to five ppm" recommendation from the OSHA website, Marathon's counsel objected. (Doc. 161, #9828–29). The Court responded:

> I think it's incumbent upon the parties to disclose the experts on which they intend to rely, and then disclose the substance of those experts' opinion, and then disclose the bases on which the expert has relied to form those opinions as part of the expert discovery process. And I don't intend to allow experts to have a certain set of bases for their opinions for purposes of discovery, and then in terms of trying to establish admissibility or for testimony at trial, all of a sudden have a different set of bases for their opinions.

(*Id.* at #9832). As Marathon's counsel continued to object to Pue's new bases, the Court returned to that same theme:

> What I'm still stuck on is [Marathon counsel's] objection that this is undisclosed testimony. I guess you can elicit it [for purposes of the *Daubert* hearing], because it's just going to me, anyway. But I will tell

---

[7] In fairness to Pue, the Court specifically asked whether low-level exposure to $H_2S$ had been tested in animals. (Doc. 161, #9834). Pue responded in the affirmative and claimed his general causation opinion relied in part on these studies. (*Id.* at #9834–35). Indeed, when told his opinion could not be based on a pure hunch, he pointed specifically to the animal studies as demonstrate he was not speculating. (*Id.* at #9907–08). Yet if these studies did indeed factor into his opinion, he did not disclose that in his reports or during his deposition.

you, I'm not going to consider opinions that were not fairly disclosed in connection with the expert discovery part of this case. I don't think it's appropriate, as I tried to make clear at the outset, to sort of do expert opinion by ambush. You know, the way discovery works, you have to—everybody puts their opinion out up front, and their bases for it, and then those are the opinions that they offer during hearings and during trial. And so I'm just not comfortable with the doctor—if he is [allowed to testify], and I haven't ruled on that, but I'm not going to allow him to offer a bunch of additional opinions on an ad hoc basis here that were not disclosed to the other party.

(*Id.* at #9846).

Finally, at the end of the *Daubert* hearing, Pue refined his general causation theory once more. As the hearing was about to end, the Court asked a clarifying question about Pue's understanding of low-level $H_2S$ exposure and its effects. (Doc. 162, #9966). In response, Pue (finally) explained how and why he thought $H_2S$ could cause breathing problems when a person with asthma receives chronic exposure in small doses over time. (*Id.*).

He described that because $H_2S$ is an inflammatory irritant, repeated exposure in low doses causes (1) the cilia (e.g., small hairs in the throat) to become thicker and longer over time, (2) hypertrophy (e.g., enlargement) of the mucus glands, and (3) hypertrophy of the muscles surrounding the airway. (*Id.*). Pue called this process "airway remodeling." (*Id.*). But then Pue further explained that *any irritant* at sufficient levels can cause "airway remodeling" from long-term exposure—$H_2S$ was merely one of potentially many culprits. (*Id.* at #9968–69). He testified that even exposure to common inflammatory agents, like common allergens, could cause the same outcome. (*Id.* at #9969). He could not provide any literature supporting this theory. (*Id.*). Instead, Pue simply testified airway remodeling was "general

31

knowledge" and "goes back to medical school mechanisms of development of asthma." (*Id.* at #9969–70).

As with most other aspects of his opinion, Pue's newfound "airway remodeling" theory surprised Marathon's counsel. She argued: "This analysis, this description of how and why that we are about to get into was not included in Pue's report, either of them, the March 2019 report, nor the October 2020 report." (Doc. 161, #9843–44). Adkins's counsel responded it was Marathon's counsel fault she had not asked Pue "what the mechanism of injury is" during the deposition. (*Id.* at #9847). Not so. Marathon's counsel had asked Pue at his deposition "what does hydrogen sulfide do to the human body." (Doc. 120, #8053). Pue himself confirmed this. (*Id.* at #8084–85).[8] And deposition testimony aside, Pue's *reports* needed to include a "*complete* statement of all opinions [he] will express." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). In any event, Marathon's counsel objected to this novel explanation, and the Court again warned it would not "allow him to offer a bunch of additional opinions on an ad hoc basis here that were not disclosed to the other party." (Doc. 162, #9846).

To recap, Pue now claims his general causation opinion rests on an airway remodeling theory. This specific theory, by name or otherwise, does not appear in his reports nor his deposition testimony. Further, Pue now claims his opinion relies on his prior experiences as a clinical pulmonologist with patients allegedly exposed to

---

[8] Pue volunteered at the start of the second day of his deposition: "[Y]ou were asking me about mechanisms and I had read it before, so I reread it, so I read some of that stuff about the mechanism of how hydrogen sulfide is—is processed in the body and cleared from the body and its mechanism of action on the lungs and on the body." (Doc. 120, #8084–85). So clearly Pue understood he had been asked about the mechanism of injury.

H$_2$S, articles by Jappinen, Hessel, Guidotti, Richardson, Lopez, and Holbert, recommendations found on the OSHA website, and guidelines by the ATS. Of these, Pue's reports cite only Hessel. He disclosed *everything else* either (1) days before his deposition, (2) during his deposition, or (3) at the *Daubert* hearing.

Taken together, Pue's proposed trial testimony on general causation, as currently presented and supported, cannot be properly traced to his disclosures in his reports. Accordingly, Pue has not complied with Rule 26(a)(2)(B)(i).

Failing to comply with Rule 26(a) has consequences. Under Rule 37(c)(1), "[i]f a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[T]he sanction is mandatory" unless properly explained. *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010); *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (holding Rule 37(c)(1) "requires absolute compliance" with Rule 26(a)). The failure is justified or harmless where:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)). For example, a disclosure will be deemed harmless where the opposing party "had all the information relevant … in its possession" and "had a full opportunity during [the] deposition to

question" about the relevant issue. *Jordan v. City of Cleveland*, 464 F.3d 584, 601 n.22 (6th Cir. 2006). The core goal is to "separate 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Bisig v. Time Warner Cable Inc.*, 940 F.3d 205, 221 (6th Cir. 2019) (citations omitted).

"Where exclusion necessarily entails dismissal of the case, the sanction must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction." *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004)). Still, "[d]istrict courts have broad discretion to exclude untimely disclosures of expert-witness testimony." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

Pue's failure to comply with the Federal Rules presumptively warrants exclusion of any general causation opinion, or bases for such an opinion, that were not fairly disclosed in his timely initial report. Fed. R. Civ. P. 37(c)(1). Accordingly, the Court applies the *Howe* factors to determine whether Pue's infraction can be considered justified or harmless, overcoming exclusion. Here, the Court concludes the *Howe* factors fail to save Pue's later-disclosed opinions and sources.

Let's run through the factors. At his deposition and *Daubert* hearing, Pue admitted his opinion relied on previously undisclosed sources. Thus, his omissions created surprise (for both Marathon and the Court) and deprived Marathon of time to prepare and have a "full opportunity during [the] deposition to question" Pue about

his opinion. *Jordan*, 464 F.3d at 601 n.22. Further, this evidence is important. Causation, both general and specific, is a key dispute between the parties.

Moving on, Pue's haphazard disclosure tactics may well disrupt trial. Even at his *Daubert* hearing, Pue continued to disclose new sources and new theories—to which Marathon objected. If the Court does not exclude this new information, fairness considerations would require the Court to re-open discovery to allow Marathon an opportunity to explore Pue's "clarified" opinions and their bases. Given that this dispute is close to eight years old, further delay is not warranted.

Pue's excuse is deficient. He claims he did not need to disclose all his sources in his expert reports because only specific articles were "pertinent to certain points that [he] wanted to make at that time," even though his opinion actually relied (or so he now says) on additional articles. (Doc. 120, #8032). Again, that's not how expert discovery works. It is not a game of hide-and-seek, allowing an expert to withhold opinions and bases for them until it suits them. *See Roberts ex rel. Johnson*, 325 F.3d at 783 (acknowledging a failure to disclose is not harmless where opposing counsel did not previously know the substance of the expert's testimony).

At this stage, no less-harsh sanction is reasonable. *See Dickenson*, 388 F.3d at 983. The obvious alternative would be to re-open expert discovery. But as discussed, it is too late in the day for that course. This case has been pending for some eight years when including the Louisiana proceedings. (Doc. 119-2). Experts have presented their reports. Depositions have occurred. Discovery has closed. Cross-motions for summary judgment have been filed. Motions to limit testimony have been

filed. And the Court had conducted a two-day *Daubert* hearing delving into Pue's general causation opinion. To allow Pue to now prepare and issue a comprehensive supplemental report to cure his disclosure omissions would defeat many of the goals that the Federal Rules of Civil Procedure seek to achieve.

The Court acknowledges that excluding Pue's untimely disclosures is a severe sanction. Moreover, the Court emphasizes that it does not exclude Pue for a lack of credentials. But the Federal Rules exist for a reason. The Court cannot ignore Adkins's seeming disregard towards them. Nor can the Court overlook the consequences that Adkins's nondisclosure of Pue's opinions imposed on Marathon's ability to prepare its case. And as Marathon's counsel's did not have the full opportunity to research and thus probe Pue's sources, the Court is concerned whether it could properly perform its own gatekeeping function under Rule 702. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 613–14 (11th Cir. 2019) (Tjoflat, J., dissenting) (recognizing that where an expert provides evolving theories, "he is effectively able to bypass [the District Court's] gatekeeping function" under Rule 702).

In sum, the Court excludes Pue from testifying as to any opinion, or basis for his opinion, that was not fairly disclosed in his initial report.

### b.    *Pue's initial report does not substantiate the general causation opinion he intends to offer at trial.*

That leaves Pue's timely-filed March 1, 2019, report. As noted above, one problem with that report is that it is so conclusory that it may well fail to satisfy Rule 26(a)'s disclosure requirements. But put that aside. Even if that report is read as

disclosing that Pue intends to testify that repeated, low-level exposure to $H_2S$ causes pulmonary problems for people with pre-existing asthma, his opinion in that regard still must meet the admissibility standards of Rule 702 and *Daubert*. Here, it doesn't.

"[A]dmitting expert testimony is not a decision a court should undertake lightly, as juries tend to place extra weight on expert opinions." *Navarro v. Procter & Gamble Co.*, 1:17-cv-406, 2021 WL 868586, at *2 (S.D. Ohio Mar. 8, 2021) (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993)). As set forth in *Daubert*, Courts play a "gatekeeping" role to ensure a jury does not hear "junk science" or otherwise unreliable evidence. *Kumho Tire*, 526 U.S. at 141.

This gatekeeping role incorporates a three-part test. "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Next, "the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* Finally, and critically here, "the testimony must be reliable." *Id.* Relevant considerations include "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94).

At its core, reliability requires the expert (1) to use a reliable methodology, and (2) to base his or her opinions on reliable facts or data. *In re Scrap Metal*, 527 F.3d at

529. While reliability is a "flexible concept," an expert's opinion must have *some* basis. *Id.* at 529–30. Speculation without support won't cut it. *Id.*

At the *Daubert* hearing, Pue named exactly one article in his initial report that he claims supports this opinion that long-term, low-level exposure to $H_2S$ fumes can aggravate a patient's asthma and cause a respiratory injury—the Hessel article. (Doc. 120-9, #8258; Doc. 162, #9926–27). That article, though, does not provide a reliable basis for the opinion he seeks to offer.

In Hessel, researchers studied oil and gas workers in Alberta, Canada, who had been exposed to high-levels of $H_2S$. (Doc. 120-6, #8239). The paper found that subjects who suffered a "knockdown" event (i.e., passed out as the result of a high-level exposure to $H_2S$) showed lingering respiratory symptoms including shortness of breath and wheezing. (*Id.* at #8238–39). At the *Daubert* hearing, Pue extrapolated from these high-level findings. He proposed they indirectly supported his theory that "low-level exposures to $H_2S$ [can] caus[e] permanent changes, decline in lung function as evidenced by shortness of breath, wheezing, and attacks of wheezing … that are statistically significant and are indicative of bronchospasm in patients who have underlying asthma and are exposed to low levels of $H_2S$." (Doc. 161, #9869).

The main problem with that argument is that the Hessel study itself explicitly says the *opposite*: "This study did not show evidence of measurable pulmonary health effects as a result of exposures to $H_2S$ that were intense enough to cause symptoms but not intense enough to cause unconsciousness. Even the large concentrations leading to a loss of consciousness did not appear to affect pulmonary function." (Doc.

120-6, #8239). When the Court pointed out this discrepancy at the hearing, Pue pivoted to validating his opinion based on the late-disclosed Jappinen article and ATS guidelines. (Doc. 161, #9869–70). But, as noted above, the Court is excluding those references.

In short, Pue has not shown that his initial report provides a reliable basis for his general causation opinion. To the contrary, his opinion contradicts the express findings set forth in the Hessel article, and he provides no good justification for why that is so. Without more, his opinion amounts to sheer speculation. *In re Scrap Metal*, 527 F.3d at 530. It is not "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Thus, the Court excludes Pue's general causation testimony in its entirety.

### c.    *Pue cannot testify as to specific causation.*

Adkins also believes Pue should be permitted to testify as to specific causation. However, showing specific causation usually requires conducting a differential diagnosis. *Pluck*, 640 F.3d at 678. And here, Pue admitted his specific causation opinion relied not on his own differential diagnosis but on the differential diagnosis that Gomes performed. (Doc. 120, #8058).

Granted, at the *Daubert* hearing, Adkins's counsel disputed that Pue did not perform his own differential diagnosis. (Doc. 161, #9852–54). But in the briefing, Adkins told a different story: "[Marathon complains] that Dr. Pue failed to perform a differential diagnosis. … [T]his argument fails because Dr. Pue relied on the thorough differential diagnosis performed by Dr. Gomes." (Doc. 148, #9697).

39

In any event, the Court agrees Pue's reports do not detail the analysis normally demanded for an expert to reliably state their *own* conclusion on specific causation. Assessing a differential diagnosis's sufficiency and reliability—and therefore admissibility—requires the Court to answer three questions: "(1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes?" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010). Here, given the gaps in Pue's general causation opinion, he did not sufficiently "rule in" $H_2S$ fumes as a possible cause of Adkins's injury.

Further, Pue cannot base his opinion on Gomes. As described below, the Court also excludes Gomes's specific causation opinion for insufficient disclosure. Without Pue establishing his own foundation, then, it should go without saying that Pue may not simply parrot an otherwise excluded expert's inadmissible opinion. And even if Pue claimed he simply used Gomes's reports as a source of data for Pue to reach his own opinion, that won't work. As noted below, Gomes has never pointed to any scientific or peer-reviewed source to validate his theory of injury. (*See* Doc. 55, #2614–17; Doc. 55-16). So much like Pue, Gomes has not performed a reliable differential diagnosis because he did not adequately "rule in" $H_2S$ fumes. Therefore, Pue also may not testify as to specific causation.

## 2. Gomes Cannot Testify As To Causation.

With Pue's opinions out, that leaves Gomes as the only other potential candidate to provide both a general causation and a specific causation opinion. For

40

his part, Adkins's counsel says Gomes may state both causation positions as a non-retained, treating physician. (Doc. 32, #462; Doc. 146, #9677; Doc. 161, #9913). And Gomes reaches a causation opinion in his letter: "[Adkins's] continued exposure to chemical fumes contributed to [his] decline in lung function and exacerbated his pre-existing asthma" and "his pulmonary condition was aggravated by a high level exposure in 05/2012." (Doc. 55-16, #2963).

But that raises the question: Is Gomes testifying as a treating physician or a traditional expert? If deemed a traditional expert, he must produce a report that meets Rule 26(a)(2)(B)'s strictures in order to testify at trial. But here, Gomes's four-page letter (his only plausible "report") falls well short of that standard. (Doc. 55-16). First, the only outside evidence his "report" references came from Adkins's counsel. It opens: "Dear [Adkins's counsel], I have reviewed medical records and material safety data sheet and other information provided by your office for evaluation of the above referenced individual." (*Id.* at #2960). Even then he claims to have reviewed only the following: (1) "Early medical history 2006-2012," (2) "Injury Report," (3) "Marathon company report and subsequent records," and (4) "Various treatment records." (*Id.*). Second, throughout the opinion, Gomes does not cite any scientific studies, peer-reviewed articles, or similar sources. Likewise, the sources he does reference provide no peer-based validation to support his conclusion that $H_2S$ "contributed to" and "exacerbated" Adkins's condition. Third, while perhaps a less egregious disclosure shortcoming, Gomes nowhere lists his rates. *See* Fed. R. Civ. P. 26(a)(2)(B)(vi).

That said, if Gomes is a treating physician testifying within the scope of his diagnosis and treatment, his letter is enough. *See id.* at 26(a)(2)(C). After all, a Rule 26(a)(2)(B) "report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007).

"Generally a treating physician can provide expert testimony regarding a patient's illness, the appropriate diagnosis, and the cause of the illness even if the physician is not among the world's foremost authorities." *Thomas v. Novartis Pharms. Corp.*, 443 F. App'x 58, 62 (6th Cir. 2011). But not always. "[C]ourts are more likely to require a treating physician to provide an expert report if the condition at issue leaves room for debate as to the specific ailment and its sources." *Fielden*, 482 F.3d at 871 (citing *Gonzalez v. Exec. Airlines, Inc.*, 236 F.R.D. 73, 81 (D.P.R. 2006)).

So where do Gomes's causation opinions place him? Making that determination requires considering multiple factors:

> (1) whether the alleged treating physician was retained to provide expert testimony; (2) whether the physician formed his or her opinions at the time of treatment or in anticipation of litigation; (3) whether the lack of a full expert report would implicate Rule 26's purposes of avoiding surprise and unnecessary depositions; (4) whether any expert opinion on causation was formed during the course of treatment; and (5) whether the claimed physician will testify to issues beyond those ordinarily present in his or her medical training.

*Barnes v. CSXT Transp., Inc.*, No. 3:13-cv-525, 2017 WL 1334303, at *13 (W.D. Ky. Apr. 7, 2017) (citing *Fielden*, 482 F.3d at 870–73). "[W]here the treating physician's opinion is rendered in anticipation of litigation, courts have held that 'causation is

beyond the scope of the testimony a treating physician may provide without tendering an expert disclosure report.'" *Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 810–11 (6th Cir. 2005) (citation omitted)); *Jett v. CSX Transp., Inc.*, No. 2007–162, 2009 WL 899626, at *3 (E.D. Ky. Mar. 31, 2009) (noting a court should consider "whether there is room for debate as to causation"). A plaintiff bears the burden of showing a full report is not required. *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 559 (E.D. Mich. 2016) (citation omitted).

Start with those factors in Adkins's and Gomes's favor. Adkins claims Gomes has not been retained to provide expert testimony.[9] (Doc. 146, #9677). And as a clinical pulmonologist, Gomes has medical training and experience recognizing and diagnosing respiratory injuries. Those two points help Adkins.

The remaining factors, though, cut against labeling Gomes a treating physician for disclosure purposes. First, Adkins did not see Gomes until February 18, 2016—months *after* this litigation began in Louisiana. (Doc. 55, #2645–46). Gomes was first contacted and hired by Adkins's counsel, not Adkins himself. (*Id.*). Indeed, Adkins's counsel attended some of Gomes's appointments with Adkins. (*Id.*). In sum, Adkins's counsel clearly contacted Gomes "in anticipation of litigation."

Second, a full report from Gomes could have avoided "surprise and unnecessary depositions" because Adkins's condition left room for debate on causation. Even if H$_2$S

---

[9] Granted, there is some ambiguity around this. Dr. Gomes testified in the deposition that his employer, Ochsner Clinic, bills Adkins's counsel directly. (Doc. 55, #2647, 2650). What is less clear, though, is whether this billing accounts just for Dr. Gomes's time preparing for trial or also for Dr. Gomes's time examining Adkins. If the latter, it is difficult to say Dr. Gomes is not "retained" for purposes of trial.

exposure *could* cause Adkins's injury, it certainly is not the *only* possible cause. Adkins himself admits to exposure to other potential irritants, including seasonal allergies, asbestos, tungsten/cobalt, dust, and cleaning chemicals. (Doc. 119, #7835; Doc. 52-4, #1876). As the Sixth Circuit has recognized, "[i]n such circumstances, an opposing party will be less prepared to depose a treating physician without an expert report." *Fielden*, 482 F.3d at 871. Without the deposition, Marathon would have received next to no notice of his testimony's scope.

Third, Gomes likely did not form his causal opinion in the "course of treatment." At his first visit with Adkins February 18, 2016, Gomes performed pulmonary tests but did not pinpoint any given cause. (*See* Doc. 55-9). Then, at his second visit June 6, 2016, Gomes attributed Adkins's injury to "toxic fume inhalation" in a post-visit summary. (Doc. 55-11, #2916). But recall that Adkins's counsel *attended this appointment*, which occurred well after Adkins and his counsel had sued Marathon on this same "toxic fumes" theory. (Doc. 55, #2645).

Moreover, Gomes appears to have formed his causation opinion based on selective information Adkins's counsel provided. In his letter addressed to Adkins's counsel, Gomes admits he reached his conclusions after "review[ing] medical records and material safety data sheet and other information provided by your office for evaluation of [Adkins]." (Doc. 55-16, #2960). Gomes's reliance on Adkins's counsel— rather than Adkins alone—further shows Gomes did not reach these opinions in the "course of treatment." *See Mohney*, 138 F. App'x at 810–11 (recognizing a physician

needed to submit an expert report where they reached their causation opinion through information provided by counsel and long after the relevant events).

Balancing the various factors, the Court concludes Gomes is a traditional expert. Thus, his proposed testimony regarding general and specific causation is expert testimony offered absent a Rule 26(a)(2)(B) expert report. *See Harville v. Vanderbilt Univ., Inc.*, 95 F. App'x 719, 724–25 (6th Cir. 2003); *Mohney*, 138 F. App'x at 810–11. That presumptively warrants exclusion.

Adkins responds that Gomes did nothing to "depart from standard treating and diagnostic procedures in formulating his diagnosis of [his] occupation lung disease and its causes." (Doc. 146, #9677). And Adkins argues Marathon has made "no cogent application of *Daubert*" or Rule 702 to exclude Gomes's opinion as a treating physician. (*Id.*).

But it is Federal Rule of Civil Procedure 26, not Federal Rule of Evidence 702, that derails Gomes's opinions.[10] While Gomes perhaps did not depart from a treating physician's standard procedures in diagnosing Adkins's symptoms, a diagnosis alone does not always prove causation. *See Bowles v. Novartis Pharm. Corp.*, No. 3:12-cv-145, 2013 WL 5297257, at *3–4 (S.D. Ohio Sept. 19, 2013) ("There is a distinction between diagnosing a medical condition and determining its cause."). Especially where, as here, many potential causes could be to blame, a party must provide a Rule 26(a)(2)(B)-compliant expert report. *See Fielden*, 482 F.3d at 871. And anyway,

---

[10] Gomes's failure to provide an expert report has also limited the Court's ability to assess Gomes's expert opinions under Rule 702 and *Daubert*. His summary disclosures do not contain the level of detail typically required for a court to assess reliability.

45

Adkins never addresses that his counsel engaged Gomes months *after* suing Marathon on this same causation theory. That fact weighs heavily in the Court's conclusion here.

Finding Adkins did not comply with Rule 26(a)(2)(B) in disclosing Gomes's opinion, the Court returns to the *Howe* factors to determine whether that deficient disclosure should render Gomes's causation opinions inadmissible. 801 F.3d at 748. And applying those factors, the Court concludes the failure here was not substantially justified or harmless.

Gomes's letter offered virtually no hint as to the "how" and "why" of his causation opinions or their bases. That left Marathon unable to meaningfully prepare for his deposition. Here again, the causation testimony is crucial. And neither Adkins nor Gomes explain Gomes's failure to compile an expert report other than their erroneous belief he is an ordinary treating physician. Sure, Marathon deposed Gomes early and so had time to cure the surprise. Nonetheless, on balance, the Court finds that Gomes's failure to submit a traditional expert report is not justified or harmless. *See Harville*, 95 F. App'x at 724–25 (affirming a district court's exclusion of a physician's expert testimony for failure to issue a Rule 26(a)(2)(B) report).

Finally, like with Pue, no other sanction besides exclusion is reasonable. Gomes's deficient "report" has similarly frustrated the Court's ability to perform its gatekeeping function under Rule 702 and *Daubert*. Indeed, Gomes is worse. Even his deposition lacks a meaningful discussion of any scientific or peer-reviewed support he relied on when forming his causation theory. (*See, e.g.*, Doc. 55, #2614–17 (failing

to provide these bases in the face of a direct request)). This further shows exclusion is the proper outcome.

Taken together, Gomes's failure to comply with Rule 26(a)(2)(B) is not substantially justified or harmless. Gomes's general and specific causation opinions are excluded. Fed. R. Civ. P. Rule 37(c)(1).

In sum, the Court excludes both Pue's causation opinions and Gomes's causation opinions. Without these opinions, Adkins does not have evidence sufficient to create a genuine dispute as to medical causation. And without that evidence, Adkins cannot prevail at trial on any of his three claims. Accordingly, the Court **GRANTS** summary judgment in Marathon's favor on those claims. *See Harville*, 95 F. App'x at 724–25 (affirming grant of summary judgment in part because expert testimony was excluded under Rule 37).

Finally, because the Court has found Marathon entitled to summary judgment on each of Adkins's claims, Adkins necessarily cannot prevail on his own Motion for Partial Summary Judgment. (Docs. 130, 135). Accordingly, the Court **DENIES** that motion.

## CONCLUSION

For the above reasons, the Court **GRANTS** Marathon Petroleum Company LP's Motion for Summary Judgment (Doc. 128) and **DISMISSES** Adkins's Second Amended Complaint (Doc. 18) **WITH PREJUDICE**. Accordingly, the Court **DENIES** Adkins's Motion for Partial Summary Judgment (Docs. 130, 135). Moreover,

the Court **DENIES** all other pending Motions **AS MOOT**. The Court **DIRECTS** the

Clerk to **ENTER JUDGMENT** and **TERMINATE** this matter from the docket.

     **SO ORDERED.**

May 4, 2023
_____
**DATE**

_____
**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

48